**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAW ENFORCEMENT HEALTH BENEFITS INC., on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.; MERCK SHARP & DOHME CORP.; SCHERING-PLOUGH CORP.; SCHERING CORP.; MSP SINGAPORE CO. LLC; GLENMARK PHARMACEUTICALS, LTD.; GLENMARK GENERICS INC., U.S.A.; and PAR PHARMACEUTICAL, INC.,<br><br>                    Defendants. | Civil Action No. 18-1900<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................. 4

III.    JURISDICTION AND VENUE ........................................................................... 7

IV.     CONTINUING VIOLATIONS ............................................................................ 9

V.      CLASS ACTION ALLEGATIONS ..................................................................... 9

VI.     REGULATORY FRAMEWORK ...................................................................... 14

        A.      The Regulatory Structure for Approval and Substitution of Generic Drugs. ....... 14

                1.      The Hatch-Waxman Amendments. .................................................. 15

                2.      Regulatory exclusivities for new drugs. .......................................... 17

                3.      ANDA paragraph IV certifications. ................................................ 18

                4.      The first filer's 180-day exclusivity period. ................................... 19

                5.      Pharmaceutical patents are frequently held to be invalid or
                        unenforceable. .................................................................................. 20

        B.      The Competitive Effects of AB-Rated Generic Competition. ............................. 21

                1.      The first AB-rated generic is priced below the brand. ..................... 23

                2.      Later generics drive prices down further. ....................................... 23

                3.      Brand manufacturers are incentivized to sell an AG at or slightly in
                        advance of the expiry of a branded drug's patents. ........................ 24

        C.      Pharmaceutical Manufacturers Game the Regulatory Structure to Impair
                Competition. ....................................................................................................... 26

                1.      No-AG agreements enable manufacturers to share the gains from
                        conspiring. ........................................................................................ 30

VII.    DEFENDANTS' CONSPIRACY ....................................................................... 34

        A.      A short primer on cholesterol-lowering drugs. .................................................. 34

        B.      Early 1990s: Merck Develops Cholesterol-Reducing Compounds .................... 36

        C.      1993-1998: Merck Applies For, and Obtains, the Original Azetidinone Patents
                (the '365, '115, and '966 Patents). .................................................................. 39

                1.      1993-1994: Merck files two patent applications addressing
                        hydroxylsubstituted azetidinone compounds useful as
                        hypocholesteremic agents. ............................................................... 41

                2.      1994-1996: Merck files a third and fourth patent application
                        addressing hydroxyl-substituted azetidinone compounds. ............. 41

# TABLE OF CONTENTS
## (continued)

Page

3.      Early 1997: Merck obtains its first azetidinone patent, covering processes (the '365 patent)......................................................................... 42

4.      Late 1997: Merck files a fifth patent application addressing azetidinones, this one addressing combination use with statins. .............. 45

5.      Mid-1998: Merck obtains a second azetidinone patent covering compounds, a composition, and a method of treating atherosclerosis (the '115 patent)................................................................................ 45

6.      Late 1998: Merck obtains a third azetidinone patent for use in combination with statins (the '966 patent)................................................ 45

D.      2000: Merck Asks the PTO to Reissue the '115 Patent With New Ezetimibe Claims. .............................................................................. 46

E.      2001-2002: Merck Obtains Approval for Zetia, the RE'721 Patent, and a Corresponding 16-Month Patent Term Extension. ................................ 47

1.      2001: Merck files an NDA for Zetia......................................................... 47

2.      2002: The PTO reissues the '115 patent as the RE'721 patent................. 47

3.      2002: The FDA approves Zetia................................................................. 48

4.      2002: Merck seeks a 16-month patent term extension for the RE'721 patent....................................................................................... 48

F.      2006: Merck Obtains its First "Sterol Non-Absorption" Patent (the '106 Patent)............................................................................................ 48

G.      2006: Glenmark Files the First ANDA for Generic Zetia. ................................ 50

H.      2007-2008: Merck Sues First Filer Glenmark; Glenmark Counterclaims........... 51

1.      Early 2007: Merck sues Glenmark for infringing the RE'721 patent (only). ..................................................................................... 51

2.      Spring 2007: Glenmark counterclaims, alleging that the RE'721 patent is invalid and unenforceable.......................................................... 52

I.      Spring 2009: Glenmark Receives Tentative Approval, and Merck Receives New Regulatory Exclusivities................................................... 57

J.      Summer 2009: Glenmark Seeks Partial Summary Judgment on Two Discrete Legal Issues........................................................................... 57

K.      Fall 2009: Merck Obtains the Second Sterol Absorption Patent (the '058 Patent)........................................................................................ 58

L.      Summer 2010: Glenmark and Par Strike a Deal and Merck and Glenmark Settle With a Reverse Payment......................................................... 59

## TABLE OF CONTENTS
### (continued)

Page

1.  The Court sends Glenmark's double-patenting argument to trial............ 59

2.  Eight days before trial, Glenmark agrees to grant Par an exclusive
    license to sell and market generic ezetimibe in the United States. .......... 59

3.  Two days before trial, Merck and Glenmark agreed to settle by
    providing a reverse payment to Glenmark in the form of an agreement
    by Merck not to bring a competing generic to market............................. 60

4.  The no-AG agreement was a payment to Glenmark from Merck that
    benefited Glenmark and Par....................................................................... 63

5.  The value of the no-AG agreement to Merck. ........................................... 66

6.  The value of the no-AG promise to Glenmark and Par. .......................... 69

M.  2010-2013: After Settling With Glenmark, Merck Seeks Another Reissue
    and Sues More Generics. ................................................................................ 71

    1.  Summer 2010: Merck admits invalidity and seeks reissue of the
        RE'721 patent. ......................................................................................... 71

    2.  Summer 2010: Merck sues Mylan and Teva for infringing the
        RE'721 patent; both counterclaim. ........................................................ 72

    3.  Spring 2011: The Federal Circuit functionally overturns the *Glenmark*
        "error" summary judgment decision......................................................... 73

    4.  Summer 2011: Merck obtains reissuance of RE'721 patent (RE'461)..... 74

    5.  Summer 2011-2012: The Mylan and Teva litigations resolve.................. 74

    6.  2012: After a trial, the *Mylan* court found no inequitable conduct on
        inventorship (only)................................................................................... 77

    7.  2012-2013: Schering sues Sandoz; Sandoz counterclaims; the parties
        settle......................................................................................................... 77

N.  2016: Glenmark and Par Launch a Generic Form of Zetia; Merck Does Not...... 79

O.  2017: 180 days later, Five More Generics Launch. ............................................ 80

P.  The No-AG Promise Was a Large Reverse Payment. ......................................... 82

VIII.   THE SCHEME'S EFFECTS ON COMPETITION AND HARM TO LEHB AND THE
        CLASSES ................................................................................................................. 83

IX.     MARKET POWER AND DEFINITION ................................................................... 84

X.      ANTICOMPETITIVE EFFECTS .............................................................................. 87

XI.     ANTITRUST IMPACT AND INTERSTATE COMMERCE ......................................... 88

XII.    EFFECT ON INTRASTATE COMMERCE................................................................ 89

**TABLE OF CONTENTS**
**(continued)**

Page

XIII.  DEFENDANTS' FRAUDULENT CONCEALMENT TOLLED THE APPLICABLE STATUTES OF LIMITATIONS AND DELAYED ACCRUAL OF LEHB'S CAUSES OF ACTION .......................................................................................... 90

XIV.  CLAIMS FOR RELIEF ...................................................................................... 91

FIRST CLAIM FOR RELIEF
Violations of Sections 1 of the Sherman Act  (On Behalf of Plaintiff and the Injunctive Relief Class)........................................................................................................ 91

SECOND CLAIM FOR RELIEF
Violation of Section 2 of the Sherman Act (On Behalf of Plaintiff and the Injunctive Relief Class)........................................................................................................ 93

THIRD CLAIM FOR RELIEF Violation of State Antitrust Laws (On Behalf of Plaintiff and the Damages Class)...................................................................................... 94

FOURTH CLAIM FOR RELIEF
Violation of State Consumer Protection Statutes (On Behalf of Plaintiff and the Damages Class)................................................................................................. 97

FIFTH CLAIM FOR RELIEF
Unjust Enrichment (On Behalf of Plaintiff and the Damages Class) ............................ 101

XV.  PRAYER FOR RELIEF ................................................................................... 106

XVI.  JURY DEMAND ............................................................................................. 107

Plaintiff Law Enforcement Health Benefits Inc. ("LEHB" or "Plaintiff") brings this class action, on behalf of itself and all others similarly situated, for claims under federal and state antitrust, consumer protection, and unjust enrichment laws to recover damages and to obtain injunctive and equitable relief for injuries caused by Merck & Company, Inc., Merck Sharp & Dohme Corporation, Schering-Plough Corporation, Schering Corporation, and MSP Singapore Company LLC (collectively, "Merck"), Glenmark Pharmaceuticals Limited and Glenmark Generics Inc., U.S.A. (collectively, "Glenmark"), and Par Pharmaceutical, Inc. ("Par," and together with Merck and Glenmark, "Defendants"). Plaintiff's claims stem from Defendants' anticompetitive scheme unreasonably to restrain competition in the market for Zetia® and its AB-rated generic equivalents sold in the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.    This complaint stems from a scheme by Defendants Merck, Glenmark, and Par to make billions of dollars by delaying competition for the cholesterol-reducing drug ezetimibe. For years, Merck earned handsome returns on the branded version of this drug, Zetia. Glenmark aimed to challenge Merck's monopoly and to sell generic Zetia and applied to the FDA for the right to do so. It appeared as though competition benefiting consumers was on the horizon. Merck sued for patent infringement, and Glenmark responded that the patents underlying Zetia were invalid because they had been obtained through fraud. Then, on the eve of trial, when it seemed Glenmark was going to prevail, the parties settled. The settlement resulted in a sweetheart deal involving an agreement that Glenmark and Par, Glenmark's U.S. distributor, would forego competing for five years, leaving Merck as the entrenched monopolist, and that when it was Glenmark's and Par's turn to dominate the market, Merck would return the favor by

not manufacturing its own generic version of Zetia to compete with them. All three have profited enormously from their illegal conspiracy, at the expense of LEHB and those similarly situated.

2.    ***Merck develops Zetia.*** In the early 1990s, following its success with statins,[1] Merck sought to identify new compounds that could reduce cholesterol and prevent the buildup of plaques in arteries. Merck turned to a class of drugs first developed forty years earlier: ACAT inhibitors.[2] Ultimately, Merck developed a compound called "ezetimibe." Merck obtained three patents purportedly covering its new compound, one of which was U.S. Patent No. RE37,721 (the "RE'721 patent"). Beginning in late 2002, Merck marketed ezetimibe as the blockbuster drug Zetia.

3.    ***Glenmark was the first filer, earning 180 days of generic exclusivity.*** In 2006, Glenmark became the first generic manufacturer to seek FDA approval to market generic Zetia. As the first filer, Glenmark earned the right to keep other generic companies off the market for 180 days. Significantly, though, Glenmark could not keep Merck from selling or licensing its own generic (referred to as an "authorized generic" or "AG"). Brand companies frequently launch or license authorized generics, particularly during a first filer's 180-day exclusivity period, in an effort to prevent the massive loss of revenue a brand suffers when generics enter the market. The brand's authorized generic typically takes up to 50% of generic sales away from the first filer. In effect, an authorized generic permits the brand to capture some of its sales that it otherwise would lose to the first filer generic. In its Abbreviated New Drug Application

---

[1] Statins, also known as HMG-CoA reductase inhibitors, are a class of lipid-lowering medications and have been found to reduce cardiovascular disease and mortality in those who are at high risk of cardiovascular disease. *See infra* Section VII (A).

[2] ACAT Inhibitors are drugs taken to block the absorption of cholesterol in the intestine and inhibit cholesterol deposited within vascular walls. *See infra* Section VII (A).

("ANDA") for generic Zetia, Glenmark included a paragraph IV certification, claiming that Merck's RE'721 patent was invalid, unenforceable, or not infringed.

4. ***Merck sues to enforce its patent.*** Following the filing of Glenmark's ANDA, Merck sued Glenmark for patent infringement of the RE'721 patent. The parties litigated the patent infringement suit for more than three years.

5. ***The RE'721 patent is invalid and/or unenforceable.*** When Merck sued Glenmark for patent infringement in connection with Zetia, Glenmark counterclaimed, arguing that Merck had intentionally and deceptively failed to tell the U.S. Patent and Trademark Office ("PTO") that compounds claimed in the RE'721 patent were inherent metabolites of compounds Merck publicly disclosed years earlier. Merck also withheld references that would, at minimum, have caused the PTO examiner to query Merck about metabolites and inherency. Glenmark also asserted that—separate and apart from inequitable conduct—such inherency rendered the RE'721 patent invalid for anticipation. (Indeed, Merck knew well the dangers of inherency and later conceded the invalidity of the RE'721 patent.) Had the case resulted in a decision on the ultimate merits, Glenmark likely would have prevailed.

6. ***Unlawful pay-for-delay agreement.*** Rather than proceed to trial and risk losing its patent protection and monopoly over Zetia, Merck decided to settle with Glenmark. As part of the settlement Merck agreed to pay Glenmark to stay out of the ezetimibe market for nearly five years and agreed not to launch its own authorized generic version of Zetia. Merck's no-authorized-generic ("no-AG") promise was worth an $800 million in additional sales to Glenmark during its 180-day exclusivity period that would have gone to Merck had it launched an authorized generic.

7.      *Earlier generic entry.* In the absence of Merck's large and unjustified payment, Glenmark and Merck each would have launched a generic version of Zetia as early as December 6, 2011, and, in any event, well before December 12, 2016, the date Glenmark agreed to enter the market. Additional generics would have launched six months later, after Glenmark's 180-day exclusivity period expired. The availability of these additional generics to the market would have continued to drive prices down to the benefit of all drug purchasers.

8.      *Injury to the Classes.* As a result of Defendants' unlawful pay-for-delay agreement, Merck continued to sell Zetia at supracompetitive prices without competition for an additional five years past December 6, 2011. Drug purchases likely paid hundreds of millions of dollars in overcharges as a result of Merck and Glenmark's unlawful agreement. In the absence of this unlawful agreement, Glenmark would have entered the market earlier than December 2016, ending Merck's monopoly and bringing competition and lower prices to consumers of ezetimibe, as well as to third party payors who reimburse all or part of the purchase price of ezetimibe. To redress the injury to the ezetimibe market, Plaintiff brings this action on behalf of two classes: (1) a nationwide injunctive relief class seeking to restrain Defendants' unlawful conduct, as well as other equitable relief; and (2) a state law damages class consisting of class members who purchased or reimbursed part or all of the purchase price of Zetia or its AB-rated generic equivalents.

## II.      PARTIES

9.      Plaintiff LEHB is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code to provide health benefits to its eligible participants and beneficiaries. LEHB's members are current and retired sworn Philadelphia Police Officers, Deputy Sheriffs, County Detectives and their dependents. LEHB was established pursuant to a duly executed Trust Agreement for the purpose of providing medical, surgical and hospital care

or benefits, including dental, optical and prescription drug benefits, to approximately 23,000 beneficiaries and covered spouses and dependents. LEHB maintains its principal place of business in Philadelphia, Pennsylvania. During the Class Period (hereinafter defined), LEHB purchased and/or provided reimbursement for some or all of the purchase price for Zetia or its generic equivalents, other than for resale, at supracompetitive prices, in Georgia, New Jersey, and Pennsylvania. LEHB paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers. Given its plan members' past purchases of Zetia and generic Zetia, LEHB anticipates that it will continue to purchase and/or provide reimbursement for Zetia and generic Zetia in the future, and thus has been and will continue to be injured by Defendants' conduct.

10. Merck & Company, Inc. is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033. It is or was the parent company of defendants Merck Sharp & Dohme Corporation and MSP Singapore Company LLC. Merck & Company, Inc. is registered with the New York Department of State as a foreign corporation and maintains a registered agent in New York.

11. Merck Sharp & Dohme Corporation is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033. It is a subsidiary of Merck & Company, Inc. and the assignee of patents relevant to this lawsuit.

12.    Schering-Plough Corporation was a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033.

13.    Schering Corporation was a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033. It was a wholly owned subsidiary of Schering-Plough Corporation and the original assignee of the relevant patents.

14.    In 2009, as part of Merck & Company, Inc.'s acquisition of Schering-Plough Corporation, Merck & Company, Inc. merged into Schering-Plough Corporation. Schering-Plough Corporation subsequently changed its name to Merck & Company, Inc., and the company originally known as Merck & Company, Inc. changed its named to Merck Sharp & Dohme Corporation.

15.    MSP Singapore Company LLC ("MSP") is a company organized and existing under the laws of the state of Delaware, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, NJ 07033. MSP is a subsidiary of Merck & Company, Inc. and was the exclusive licensee of the relevant patents.

16.    Merck & Company, Inc., Merck Sharp & Dohme Corporation, Schering-Plough Corporation, Schering Corporation, and MSP Singapore Company LLC are collectively referred to in this complaint as "Merck."

17.    Glenmark Pharmaceuticals Limited is a company organized and existing under the laws of India, with its corporate office at Glenmark House, B. D. Sawant Marg, Andheri (E), Mumbai 400 099, India, and its registered office at B/2 Mahalaxmi Chambers, 22, Bhulabhai Desai Road, Mumbai 400 026, India.

18.     Glenmark Generics Inc., U.S.A., formerly known as Glenmark Pharmaceuticals Inc., U.S.A. is a corporation organized and existing under the laws of the State of Delaware and having its principal place of business at 750 Corporate Drive, Mahwah, New Jersey 07430. It is a wholly owned subsidiary of Glenmark Pharmaceuticals Limited.

19.     Glenmark Pharmaceuticals Limited and Glenmark Generics Inc., U.S.A. are collectively referred to in this complaint as "Glenmark."

20.     Par Pharmaceutical Inc. ("Par") is a corporation organized and existing under the laws of the State of New York and having its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977. Par is a wholly owned subsidiary of Endo International plc, an Irish corporation with its principal place of business located in Dublin, Ireland. In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc., and combined it with its existing generics subsidiary, Qualitest Pharmaceuticals, naming the segment Par Pharmaceutical, Inc.

21.     Merck, Glenmark and Par are collectively referred to in this complaint as "Defendants."

22.     Defendants' wrongful actions described below were and are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

III.     JURISDICTION AND VENUE

23.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for

7

the injuries sustained by Plaintiff and the members of the Classes by reason of violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

24.     This action is also instituted for damages and equitable relief under the antitrust, consumer protection, and common laws of various states, as described more fully in the Claims for Relief, *infra* Section XIV.

25.     Pursuant to 28 U.S.C. §§ 1331 and 1337, Section 16 of the Clayton Act (15 U.S.C. § 26), and 28 U.S.C. § 1367, jurisdiction is conferred upon this Court.

26.     Pursuant to 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C § 1391(b), (c) and (d) (general venue provisions), venue is proper in this judicial district because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Further, Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

27.     Moreover, all Defendants are headquartered within 50 miles of this District and LEHB is located in nearby Philadelphia, Pennsylvania. Due to the proximity of all parties and their respective witnesses and documents, this District is convenient. This District has demonstrated considerable expertise in the management of complex antitrust cases, including those that, like the instant action, involve allegations of anticompetitive conduct in the pharmaceutical industry.

28.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance

of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    CONTINUING VIOLATIONS

29.    This complaint alleges a continuing course of conduct (including conduct within any relevant limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, LEHB and the members of the Damages Classes can recover for damages that they suffered during any applicable limitations period.

## V.    CLASS ACTION ALLEGATIONS

30.    LEHB, on behalf of itself and all other similarly situated indirect purchasers, seeks damages, measured as overcharges, trebled where available under applicable law, against Defendants based on allegations of anticompetitive conduct in the market for Zetia and its AB-rated generic equivalents.

31.    LEHB brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of a Class of indirect purchasers (the "Injunctive Relief Class") defined as follows::

> All persons or entities in the United States and its territories who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for brand Zetia or its AB-rated generic equivalents, beginning at least as early as December 6, 2011, and ongoing until the effects of Defendants' conduct cease (the "Class Period").

32.    The following persons or entities are excluded from the proposed Injunctive Relief Class:

a. Defendants, including any predecessor or successor of Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates;

b. All federal and state governmental entities, except for governmental-funded employee benefit plans;

c. All persons or entities who purchased Zetia or its AB-rated generic equivalent for purposes of resale or directly from Defendants or their affiliates, including any predecessor or successor of Defendants;

d. Fully insured health plans (i.e., health plans that purchased insurance covering 100% of the plan's reimbursement obligations to its members);

e. Any "flat co-pay" consumers whose purchases of Zetia or generic Zetia were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

f. Pharmacy benefit managers; and

g. The judges or justices involved in this action and any members of their immediate families.

33.    LEHB also brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) seeking damages pursuant to the antitrust, unfair competition, and consumer protection laws of the states and territories listed in the Claims for Relief, LEHB also brings this action on behalf of itself and as a class action under, and the common law of unjust enrichment, on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid, and/or provided reimbursement for brand Zetia or its AB-rated generic equivalents during the Class Period (i.e., beginning at least as early as December 6, 2011, and ongoing until the effects of Defendants' conduct cease).

34.    The following persons or entities are excluded from the proposed Damages Class:

a. Defendants including any predecessor or successor of Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates;

b. All federal and state governmental entities, except for governmental-funded employee benefit plans;

    c.   All persons or entities who purchased Zetia or its AB-rated generic equivalent for purposes of resale or directly from Defendants or their affiliates, including any predecessor or successor of Defendants;

    d.   Fully insured health plans (i.e., health plans that purchased insurance covering 100% of the plan's reimbursement obligations to its members);

    e.   Any "flat co-pay" consumers whose purchases of Zetia or generic Zetia were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

    f.   Pharmacy benefit managers; and

    g.   The judges or justices involved in this action and any members of their immediate families.

35.    Together, the Injunctive Relief Class and the Damages Class are referred to as the "Classes."

36.    Members of the Classes are so numerous and so geographically dispersed that joinder of all members of the Classes is impracticable. Plaintiff believes that there are thousands of members of both Classes widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together. Further, the Classes are readily identifiable from information and records in Defendants' possession.

37.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for branded and generic Zetia and were deprived of the benefits of earlier and more robust competition from cheaper generic equivalents of Zetia as a result of Defendants' wrongful conduct.

38.    Plaintiff will fairly and adequately protect and represent the interests of the members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes.

39.     Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular experience with class action antitrust litigations involving pharmaceutical products.

40.     Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to the entire Classes, thereby rendering overcharge damages with respect to the class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

41.     Questions of law and fact common to the Classes include, but are not limited to:

a.  Whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive generic suppression scheme;

b.  To the extent such justifications exist, whether there were less restrictive means of achieving them;

c.  Whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

d.  Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

e.  Whether Defendants' scheme, in whole or in part, has substantially affected intrastate commerce;

f.  Whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and other members of the Classes;

g.  Whether and when Par knew of Merck and Glenmark's agreement to delay generic competition for Zetia, and what conduct it engaged in to further the conspiracy;

h.  Whether Defendants conspired to delay generic competition for Zetia;

i.  Whether, pursuant to the reverse payment agreement, Merck's promise not to compete against Glenmark's generic product constituted a payment;

12

j.  Whether Merck's agreement with Glenmark was necessary to yield some cognizable, non-pretextual procompetitive benefit;

k.  Whether Merck's compensation to Glenmark was large and unexplained;

l.  Whether the reverse payment agreement created a bottleneck to further delay generic competition for Glenmark;

m.  Whether Par received any compensation or promise from Glenmark or Merck in connection with Merck's agreement with Glenmark;

n.  Whether Par and Glenmark's licensing agreement was informed and/or revised by expectations from the reverse payment agreement between Merck and Glenmark;

o.  Whether the reverse payment harmed competition;

p.  Whether, before December 12, 2016, Merck possessed the ability to control prices and/or to exclude competition for Zetia and its AB-rated generic equivalents;

q.  Whether, from December 12, 2016 through June 12, 2017, Merck and Glenmark possessed the ability to control prices and/or to exclude competition for Zetia and generic Zetia;

r.  Whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Zetia;

s.  Determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic conduct caused;

t.  Whether, and if so to what extent, Defendants' conduct caused antitrust injury (i.e., overcharges) to LEHB and Class members;

u.  Whether the alleged scheme violated the Sherman Act as alleged in the First and Second Claims for Relief herein;

v.  Whether the alleged conduct violated state laws, as alleged in the Third and Fourth Claims for Relief herein;

w.  Whether Defendants unjustly enriched themselves to the detriment of LEHB and the members of the Classes, thereby entitling LEHB and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fifth Claim for Relief herein;

x.  Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of LEHB and the members of the Classes;

13

y.  The effect of Defendants' alleged conduct on the prices of Zetia and generic Zetia sold in the United States during the Class Period;

z.  The appropriate injunctive and related equitable relief for the Injunctive Relief Class; and

aa. The appropriate class-wide measure of damages for the Damages Class.

42.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that practicably could not be pursued individually, substantially outweigh potential difficulties in management of this class action.

43.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

44.    Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.    REGULATORY FRAMEWORK

### A.    The Regulatory Structure for Approval and Substitution of Generic Drugs.

45.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[3] manufacturers that create a new drug must obtain approval from the Food and Drug Administration ("FDA") to sell the product by filing a New Drug Application ("NDA").[4] Complete NDAs include specific data

---

[3] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 *et seq.*).

[4] 21 U.S.C. §§ 301-392.

concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[5]

46.    When the FDA approves a brand manufacturer's NDA, the manufacturer may cause the FDA to list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") certain kinds of patents that the manufacturer asserts could reasonably be enforced against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patent(s).[6] A brand manufacturer has 30 days in which to list patents issued after approval of an NDA in the Orange Book in order for the patent to be considered timely filed patent.[7]

47.    The FDA performs only a ministerial act in listing the patents identified by the brand manufacturer in the Orange Book. The FDA does not have the authority or resources to verify the manufacturer's representations for accuracy or trustworthiness and relies completely on the manufacturer's truthfulness about the validity and applicability of any Orange Book–listed patents.

### 1.    The Hatch-Waxman Amendments.

48.    In 1984, Congress modified the FDCA by enacting the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), more commonly known as the Hatch-Waxman Amendments. The Hatch-Waxman Amendments permit a generic manufacturer to file an ANDA with the FDA that relies on the scientific findings of safety and effectiveness included in the brand name drug manufacturer's original NDA. An ANDA filer

---

[5] 21 U.S.C. § 355(a), (b).

[6] For example, patents covering processes for making drug products may not be listed in the Orange Book.

[7] 21 U.S.C. § 355(b)(1), (c)(2).

need only demonstrate that the generic drug is pharmaceutically equivalent and bioequivalent[8] (together, "therapeutically equivalent") to the brand name drug. The premise—codified by Congress and implemented by the FDA for the past thirty years—is that two drug products that contain the same active pharmaceutical ingredient, in the same dose, delivered in the same way, absorbed into the bloodstream at a similar rate over a similar period of time are expected to be equally safe and effective. The FDA assigns generics that meet these criteria relative to their brand counterparts an "AB" rating.

49.    The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical quantities of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another.

50.    Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

51.    The Hatch-Waxman Amendments achieved both goals, substantially advancing the rate of generic product launches and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013,

---

[8] Bioequivalence demonstrates that the active ingredient of the proposed generic would be present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart. *See* 21 U.S.C. § 355(j)(8)(B).

total prescription drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions.[9] When a generic form is available, generics are dispensed about 95% of the time.[10]

## 2. Regulatory exclusivities for new drugs.

52.    To promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provided for exclusivities (or exclusive marketing rights) for new drugs. If statutory requirements are met, the FDA grants these exclusivities upon approval of a drug. These exclusivities are listed in the Orange Book as covering the brand, along with any applicable patents, and can run concurrently with the listed patents.

53.    One such exclusivity, New Chemical Entity ("NCE") exclusivity, applies to products containing chemical entities never previously approved by FDA either alone or in combination. If the FDA grants a product NCE exclusivity, the agency may not accept for review any ANDA for a drug containing the same active moiety (i.e., the part of the drug that makes it work as it does) for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[11]

54.    A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that are essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve an

---

[9] *See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013*, 30, 51 (2014).
[10] *Id.* at 51.
[11] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).

ANDA for that drug for three years from the date on which the supplemental application is approved.[12]

55.    Regulatory exclusivities are not always absolute bars to generic entry. For example, some can be overcome by carving out information in the label or for other reasons.[13]

### 3.    ANDA paragraph IV certifications.

56.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

    a.    That no patent for the brand has been filed with the FDA (a "paragraph I certification");

    b.    That the patent for the brand has expired (a "paragraph II certification");

    c.    That the patent for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

    d.    That the patent for the brand is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[14]

57.    If a generic manufacturer files a paragraph IV certification, a brand manufacturer has the ability to delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-half years,[15] or (ii) the issuance of a decision by a court that the patent is invalid or not infringed

---

[12] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).

[13] *See, e.g.*, 21 C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7); 21 U.S.C. § 355a(o).

[14] 21 U.S.C. § 355(j)(2)(A)(vii).

[15] 21 U.S.C. § 355(j)(5)(B)(iii). This period is commonly called a "30-month Hatch-Waxman stay" or "30-month stay." The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the 30-

by the generic manufacturer's ANDA. Until one of those conditions is met, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (i.e., grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA is ready for final approval but for the 30-month stay.

### 4. The first filer's 180-day exclusivity period.

58.     Generics may be classified as (i) first filer generics, (ii) later generic filers, or (iii) authorized generics.

59.     To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first paragraph IV generic manufacturer ANDA filer ("first filer") a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.[16] That is, when a first filer submits a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book are either invalid or not infringed by the generic, the FDA cannot approve a later generic manufacturer's ANDA until that first generic has been on the market for 180 days.[17]

60.     The 180-day window is often referred to as the first filer's six-month or 180-day "exclusivity"; this is a bit of a misnomer, because a brand manufacturer (such as Merck) can launch an AG at any time, manufacturing its AG in accordance with its approved NDA for the branded product but selling at a lower price point. Brand manufacturers frequently launch AGs in response to generic entry to recoup some of the sales they would otherwise lose.

month stay of FDA approval, and must instead satisfy the significantly stronger showing required to obtain a preliminary injunction to prevent the generic's launch.

[16] 21 U.S.C. § 355(j)(5)(B)(iv), (D).

[17] Or, until its first filer exclusivity has been forfeited. A first filer can forfeit its 180-day exclusivity by, for example, failing to obtain tentative approval from the FDA for its ANDA within 30 months of filing its ANDA. There is no forfeiture here.

61.    The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first filer.[18]

62.    A first filer that informs the FDA it intends to wait until all Orange Book–listed patents expire before marketing its generic does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

### 5.    Pharmaceutical patents are frequently held to be invalid or unenforceable.

63.    Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the PTO, by court decision, or by jury verdict. A patent holder at all times bears the burden of proving infringement.

64.    A generic can prevail in patent infringement litigation by showing that its product does not infringe the patent (or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

65.    A patent is invalid or unenforceable when the disclosed invention is obvious in light of earlier prior art.

66.    A patent is also invalid or unenforceable when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution.

---

[18] *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2229 (2013) (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. REV. 1553, 1579 (2006)).

67.     A patent is also invalid or unenforceable when a later acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as a safe harbor, applies).

68.     The PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

69.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than that it will be upheld. An empirical study of all substantive decisions rendered in every patent case filed over a two-year period reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[19]

### B.     The Competitive Effects of AB-Rated Generic Competition.

70.     Generics contain the same active ingredient(s) and are determined by the FDA to be just as safe and effective as their brand counterparts. Because generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a branded product and its generic version, or between generic versions, is price. The only material difference between generics and their corresponding brand versions is their price. Typically, generics are at least 10% less expensive than their brand counterparts when there is a single generic competitor. This discount typically increases to 50% to 80% (or more) when

---

[19] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

multiple generic competitors compete in the sale for a given drug. Consequently, the launch of a generic usually results in significant cost savings for all drug purchasers.

71.     Since the passage of the Hatch-Waxman Amendments, every state has adopted drug product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Through substitution laws and other institutional features of pharmaceutical distribution and use, the launch of AB-rated generics results in both rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic hits the market, it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry. In a recent study, the Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%.[20]

72.     Generic competition enables all indirect purchasers of a drug to (i) purchase generic versions of the drug at substantially lower prices, and/or (ii) purchase the brand at a reduced price.

73.     Until a generic version of the brand enters the market, however, there is no bioequivalent drug to substitute for and compete with the brand, and the brand manufacturer can therefore continue to profitably charge supracompetitive prices. Brand manufacturers, such as Merck, are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to illegal means to delay or prevent generic competition.

---

[20] *See* FTC, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions 8 (2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-    offs-cost-consumersbillions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study").

### 1. The first AB-rated generic is priced below the brand.

74.    Experience and economic research show that the first generic manufacturer to market its product prices it below the prices of its brand counterpart.[21] Because of state substitution laws, the first generic manufacturer almost always captures a large share of sales from the brand. At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB-rated generic combined).

75.    During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market, though the brand's AG can be, and often is, on the market during the 180-day exclusivity period. Without competition from other generics, during the 180-day exclusivity period a first filer generic manufacturer generally makes about 80% of all of the profits that it will ever make on the product.

### 2. Later generics drive prices down further.

76.    Once generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[22]

77.    According to the FDA and the FTC, the greatest price reductions happen when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price. Some typical estimates are that a single generic results in a near term

---

[21] FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact ii-iii, vi, 34 (2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-     term-effects-and-longterm-impact-report-federal-trade-commission/authorized-generic-drugs-   short-term-effects-and-long-term-impactreport-federal-trade-commission.pdf ("FTC 2011 AG Study"); FTC Pay-for-Delay Study at 1.

[22] *See, e.g.*, Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market*, 26 INT'L J. INDUS. ORG. 930 (2008); Richard G. Frank, *The Ongoing Regulation of Generic Drugs*, 357 NEW ENG. J. MED. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, 43 J.L. & ECON. 311 (2000).

retail price reduction of around 10% as compared to the brand price, but that with two generic entrants the near term retail price reduction is about 50%.

78.    In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months.[23] (This percentage erosion of brand sales holds regardless of the number of generic entrants.) In the end, the brand manufacturer's sales decline to a small fraction of their level before generic entry. This is so because, "[a]lthough generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics."[24]

79.    Generic competition enables LEHB and all members of the proposed Classes to: (a) purchase generic versions of a drug at substantially lower prices; and/or (b) purchase the branded drug at a reduced price.

### 3.    Brand manufacturers are incentivized to sell an AG at or slightly in advance of the expiry of a branded drug's patents.

80.    Authorized generics, like other generics, compete on price.

81.    A brand manufacturer may sell an AG at any time. An AG is chemically identical to the brand but sold as a generic, typically through either the brand manufacturer's subsidiary (if it has one) or a third-party distributor. An AG is essentially the brand product in a different package, but sold at a lower price.

82.    Early in the life of the patents pertaining to a branded drug, the brand manufacturer has little incentive to sell an AG—doing so would simply cannibalize sales from

---

[23] FTC 2011 AG Study at 66-67.

[24] *See* FDA, *Generic Drugs: Questions and Answers*, http://www.fda.gov/drugs/resourcesforyou/consumers/questionsanswers/ucm100100.htm (last visited Jan. 11, 2018).

the more profitable brand product. But as the patent nears expiry, and the prospect of generic competition arises, the brand manufacturer's incentive to sell an AG increases.

83.    One study notes that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[25]

84.    Brand manufacturers sometimes begin selling AGs before the first filer generic enters the market so they can secure multiyear purchase contracts with direct purchasers and load the generic pipeline at the expense of the first filer generic.

85.    Competition from an AG substantially reduces drug prices and the revenues of the first filer generic (especially during the 180-day exclusivity period).[26] A study analyzing three examples of AGs found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[27]

86.    The FTC found that AGs capture a significant portion of sales, reducing the first filer generic's revenues by about 50% on average.[28] The first filer generic makes much less money when it faces competition from an AG because (i) the AG takes a large share of unit sales away from the first filer; and (ii) the presence of the AG causes prices, particularly generic prices, to decrease.

87.    Authorized generics are therefore a significant source of price competition. In fact, they are the only potential source of generic price competition during the first-to-file

---

[25] Kevin A. Hassett & Robert J. Shapiro, The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals 3 SONECON (2007), http://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf.

[26] Jeremiah Helm, *The Patent End Game: Evaluating Generic Entry into a Blockbuster Pharmaceutical Market in the Absence of FDA Incentives*, 14 MICH. TELECOMM. L. REV. 175, 189 (2007).

[27] Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, 26 HEALTH AFFAIRS 790, 796 (2007).

[28] FTC 2011 AG Study at 139.

generic's 180-day exclusivity period. All drug industry participants recognize this. PhRma recognizes it.[29] Generic companies recognize it.[30] So do brand companies.[31]

### C.    Pharmaceutical Manufacturers Game the Regulatory Structure to Impair Competition.

88.    When they do not face generic competition, brand manufacturers can usually sell the brand far above the marginal cost of production, generating profit margins in excess of 70% while making hundreds of millions of dollars in sales. The ability to make those kinds of profit margins—without losing so many sales to competitors that the higher price becomes unprofitable—is what economists call market or monopoly power. When generics enter the market, however, they quickly take 80% or more of the unit sales. And when multiple generics are in the market, the competition between the generics drives their prices to near the marginal cost of production. This competition puts an end to the brand manufacturer's market or monopoly power and delivers enormous savings to drug purchasers.

---

[29] Brand industry group PhRma sponsored a study that concludes that the presence of an authorized generic causes generic prices to be more than 15% lower as compared to when there is no authorized generic. IMS Consulting, *Assessment of Authorized Generics in the U.S.* (2006), http://208.106.226.207/downloads/IMSAuthorizedGenericsReport_6-22-06.pdf.

[30] One generic manufacturer stated that "[d]ue to market share and pricing erosion at the hands of the authorized [generic], we estimate that the profits for the 'pure' generic during the exclusivity period could be reduced by approximately 60% in a typical scenario." *See* FTC 2011 AG Study at 81. Another generic quantified the fiscal consequences of competing with an authorized generic version of the brand drug Paxil, determining that the authorized generic reduced its first generic's revenues by two-thirds, or by approximately $400 million. Comment of Apotex Corp. in Support of Mylan Citizen Petition (Mar. 24, 2004), http://www.fda.gov/ohrms/dockets/dailys/04/apr04/040204/04P=0075-emc00001.pdf. In 2004, generic company Teva acknowledged that an authorized generic would "severely devalu[e]" its 180 exclusivity because an authorized generic "effectively transfers much of the profit value from the generic challenger [to the authorized generic]" and "allows the [authorized generic] to seize a significant share of the generic supply chain." Teva Citizen Petition, Docket No. 2004P-0261/CPI (June 9, 2004), www.fda.gov/ohrms/dockets/dailys/04/June04/061004/04p-0261-cp00001-01-vol1.pdf.

[31] Commenting on Teva's FDA petition, Pfizer stated: "Teva's petition [to prevent the launch of an authorized generic] is a flagrant effort to stifle price competition – to Teva's benefit and the public's detriment." Comment of Pfizer at 7, Docket No. 2004P-0261 (June 23, 2004), http://www.fda.gov/ohrms/dockets/dailys/04/June04/062904/062904.htm#04P0261; Comment of Johnson & Johnson at 1, FDA Docket No. 2004P-0075 (May 11, 2004), http://www.fda.gov/ohrms/dockets/dailys/04/June04/060404/04p-0075-c00002-vol1.pdf.

89.    A brand manufacturer in the marketplace without competition from generics receives all of the profits on all of the unit sales.

90.    When the brand manufacturer competes against only the first filer generic manufacturer, they enjoy a duopoly—both tend to sell at close to the monopoly price, and make near-monopoly profits.[32]

91.    When multiple generic manufacturers enter, the brand manufacturer loses most of the unit sales; generic manufacturers sell most of the units, but at drastically reduced prices; and competition delivers enormous savings to drug purchasers.

92.    Brand and first filer generic manufacturers have a collective interest in preventing this competition from breaking out. If they work together to prevent or delay competition, they can keep the profit margins on all of the unit sales at 70% and split the resulting excess profits among themselves. They can keep for themselves the enormous savings that competition would have delivered to drug purchasers.

93.    To achieve this goal, brand and generic manufacturers sometimes—unlawfully—agree, often but not exclusively in writing, to not compete and instead split the purchaser savings between themselves.

94.    Figure 1 compares the impact on a brand manufacturer's profits between (i) a situation where it settles a patent lawsuit on the merits (i.e., with only an agreed entry date and without a pay-off to the generic company); and (ii) a situation where it settles the lawsuit with a large, unjustified payment to the generic manufacturer. In the former situation, the agreed entry date for the generic is earlier and the brand manufacturer's profits are thus greatly reduced. In the

---

[32] *See generally* Tony Ellery & Neal Hansen, *Pharmaceutical Lifecycle Management: Making the Most of Each and Every Brand* 108 (2012); Benjamin G. Druss et al., *Listening to Generic Prozac: Winners, Losers, and Sideliners*, 23 HEALTH AFF. 210, 213-4 (2004).

latter situation, the agreed entry date is later and the brand manufacturer's profits increase significantly. Earlier entry may also occur if the generic manufacturer launches its product at risk (i.e., while the litigation is still pending) or prevails in the patent litigation and then launches its product.

**Figure 1. Impact of Generic Delay on Brand Profits**



95.     In order for such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide the purchaser savings between themselves. The generic manufacturer will not refrain from competing if it does not share in the ill-gotten gains through some means. Pay-offs from the brand manufacturer are the means by which brand and generic manufacturers divide between themselves the ill-gotten gains that delayed competition makes possible. These unlawful pay-off deals are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements.

96.     The brand manufacturer may choose to pay off only the first filer, even if other generic manufacturers are also lined up to challenge the patents. The first filer's agreement to

28

delay marketing its drug also prevents other generic manufacturers from marketing their products.

97.    Later ANDA filers have more modest financial expectations because they generally anticipate no market exclusivity. By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been, or is on its way to being, commoditized.

98.    In the absence of an anticompetitive agreement between the brand company and the first filer, later ANDA filers have procompetitive incentives. They are motivated to expend resources to challenge the brand manufacturer's patent(s) (knowing that the first filer generic is also fighting a patent infringement suit) and to enter the market as early as possible.

99.    When an anticompetitive agreement with the first filer is already in place, however, pursuing the litigation to conclusion becomes less attractive to later ANDA filers. The later generic manufacturers know that the first filer is not leading the charge against the brand manufacturer's patent(s) (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive reverse payment agreement). The later generics have to bear the bulk of the litigation costs themselves and, upon prevailing in the patent litigation, expect to face competition from at least the first filer generic, and typically an authorized generic as well, despite having expended time and resources litigating the infringement case. The first settlement between a brand and first filer generic (such as the Glenmark agreement at issue here) will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer may launch then as well – greatly reducing the incentive the later filer would otherwise have to try to enter as soon as possible.

100.    Thus, some later generics decide to simply give in to or join the conspiracy between the brand manufacturer and the first filer generic and agree to drop their challenges to the brand manufacturer's patent(s) and stay off the market until after entry by the first filer.

101.    Sometimes the brand manufacturer increases the attractiveness of doing so by offering concessions on other products.

102.    Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

### 1.    No-AG agreements enable manufacturers to share the gains from conspiring.

103.    In the 1990s, the pay-offs from brand manufacturers often took the form of cash payments to the generic competitor. Since the 2000s, as a result of regulatory scrutiny, congressional investigations, and class action lawsuits, brand and generic manufacturers have entered into increasingly more elaborate agreements in an attempt to hide pay-offs.

104.    One form of pay-off, at issue here, is a no-AG promise. With a no-AG promise, the brand manufacturer agrees not to market an AG version of the brand drug for some period of time after the first generic enters the market.

105.    Again, the first filer's ANDA exclusivity does not prohibit the brand manufacturer from marketing its AG under the authority of its NDA. The Hatch-Waxman Amendments' 180-day marketing period is "exclusive" only as against other ANDA-based products, not as against the brand manufacturer's NDA-based AG.

106.    Absent a no-AG promise, it almost always makes economic sense for the brand manufacturer to begin marketing an AG as soon as (or sometimes weeks or months before) the

first generic enters the marketplace. But competition from an AG has a drastically negative effect on the first filer generic's revenues. Competition from an AG typically cuts the first filer's revenues by more than half, as the competing generic takes a substantial volume of the unit sales and drives prices lower—eliminating the duopoly and delivering commensurate savings to drug purchasers.

107.    To prevent an AG from causing this substantial loss of revenues and profits, a first filer generic may be willing to delay its entry into the marketplace in return for the brand manufacturer's agreement to forgo competing with an AG. The additional monopoly profits that the brand manufacturer gains from the delayed onset of generic competition more than make up for the profits it forgoes by not competing with an AG. The brand manufacturer gains from the delayed onset of generic competition. The first filer gains from the absence of generic competition for the first 180 days of marketing. But drug purchasers lose.

108.    The brand and first filer's reciprocal promises not to compete harm indirect purchasers like LEHB thrice over. The pact delays the first filer's entry into the marketplace and thereby extends the time during which the more expensive brand is the only product on the market. By delaying the first filer's entry, the pact also delays the time when other, later, generics enter, and may discourage their entry altogether. And the pact prevents the brand from marketing an AG during the 180-day exclusivity period, reducing price competition during that period between the first filer's generic and the brand's AG.

109.    For the first filer, the difference between selling the only generic and competing against an AG for 180 days can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales. A no-AG pledge thus has the same economic effect as

a pay-off made in cash.[33] Courts, including in this Circuit, agree that no-AG agreements are a form of payment actionable under *FTC v. Actavis* and are anticompetitive.[34]

110.    For a first ANDA filer (like Glenmark) for a brand drug with billions of dollars in annual sales (like Zetia), the difference between selling a generic without having to compete against an AG and selling in competition with an AG can amount to hundreds of millions of dollars. These economic realities are well known in the pharmaceutical industry. No-AG agreements thus allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

111.    Figure 2 depicts what happens when a settlement agreement includes a no-AG promise. The red area shows the brand manufacturer's additional monopoly profits earned during the period of delay. The purple area shows the amount of monopoly profit the brand manufacturer gives up (i.e., shares with the generic).

---

[33]    *See, e.g.,* Press Release, FTC, Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics (June 24, 2009), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade commission/p062105authgenstatementleibowitz.pdf.

[34] *See In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549-50 (1st Cir. 2016); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 716-18 (N.D. Ill. 2016); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 U.S. Dist. LEXIS 142206, at *62 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. Astrazeneca AB*, 52 F. Supp. 3d 705, 709-10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

**Figure 2. Impact of No-AG Clause on Brand Profits**



112.    Figure 3 depicts the generic manufacturer's principal considerations in deciding whether to accept a settlement that includes a no-AG promise. Without a settlement, the generic could enter earlier—either when the 30 month stay expires ("at risk") or when it wins the litigation. The generic manufacturer's profits (gross margins) would be high during the 180-day exclusivity period and then fall rapidly as additional generics enter. This profit flow is somewhat uncertain because (i) if the generic launches at risk, it could (theoretically) later be found to infringe a valid patent and (ii) it is expected that the brand manufacturer will launch an authorized generic. With a no-AG promise, the profit flow occurs later but is more certain and is larger —roughly twice the size—because the generic manufacturer does not lose half of the market to the brand manufacturer's authorized generic and can charge a higher price.

**Figure 3. Impact of No-AG Promise**



113.    Pay-offs through no-AG agreements usually exceed the value that the first filer could have obtained even if it had won the patent infringement litigation. By settling the patent case in exchange for a no-AG payoff, the first filer converts that critical six months into a period of total generic exclusivity, thus doubling its unit sales and making those sales at a higher price.

## VII.    DEFENDANTS' CONSPIRACY

### A.    A short primer on cholesterol-lowering drugs.[35]

114.    High cholesterol is associated with coronary heart disease and atherosclerosis. Atherosclerotic coronary heart disease represents the major cause for death and cardiovascular morbidity in the western world.

115.    Atherosclerosis occurs when cholesterol and other substances build up in the walls of arteries and form hard substances called plaque. Low-density lipoprotein ("LDL")

---

[35] *See, e.g.*, C. Robin Ganellin, *Discovery of the Cholesterol Absorption Inhibitor, Ezetimibe*, in C. Robin Ganellin, Stanley Roberts & Roy Jefferis, *Introduction to Biological and Small Molecule Drug Research and Development* (2013) (reviewed by Dr. Stuart B. Rosenblum, one of the inventors of ezetimibe).

molecules (or "bad" cholesterol) can contribute to atherosclerotic plaque formation on the walls of blood vessels. The narrowing of blood vessels by plaques is the main cause of heart attacks, stroke, and other vascular disease.

116.    In contrast, having large numbers of high-density lipoprotein ("HDL") particles has been shown to be cardioprotective, so that HDL cholesterol is considered "good" cholesterol.

117.    Bile acid resins or sequestrants are the oldest and safest lipid lowering agents, but are less potent than other classes now available and are not always well tolerated.[36] In the 1950s, scientists developed several drugs thought to lower cholesterol levels (hypocholesterolaemic drugs). In 1953, scientists in France reported that phenylacetic acid and its analogues—fibrates—lowered cholesterol levels.[37] This discovery led to the approval of ethyl ester clofibrate in the U.S. in 1967; but it was later found to have unacceptable side effects and was replaced with other fibrates.

118.    In 1955, scientists in Canada discovered that Niacin in high doses lowered serum cholesterol levels, but side effects were dose-limiting. The hypocholesterolemic efficacy of probucol was first demonstrated in the period 1969-1971. Although its mechanism has not been fully elucidated, it was approved by the FDA in 1977, though withdrawn from the U.S. market in 1995 in light of the growing dominance of statins.[38]

119.    In the 1970s and 1980s, scientists discovered a group of cholesterol-lowering drugs known as statins. Statins lower LDL cholesterol levels by inhibiting the enzyme that regulates the production of cholesterol in the liver, HMG-CoA reductase. In 1987, Merck

---

[36] Sergio Martinez-Hervas; Rafael Carmena; Juan F Ascaso, *Significance of LDL-C Lowering Therapy in Diabetic Patients*, J. CLIN LIPIDOLOGY, 2011;6(4):389-399.

[37] In the 1980s, scientists discovered that fibrates worked by interacting with the peroxiosome proliferator-activated receptors (PPAR-α) in the liver, muscle, and other tissues.

[38] Jie Jack Li & E. J. Corey, DRUG DISCOVERY: PRACTICES, PROCESSES, AND PERSPECTIVES (John Wiley & Sons, 2013).

received approval for and launched the first statin: lovastatin. Merck later launched a second statin: simvastatin. Statins, as a class, were for many years the most profitable drugs in pharmaceutical history.

120.    In the 1990s, however, there was a renewed interest in fibrates as (1) clinical trials demonstrated the efficacy of fibrates on cardiovascular events, (2) the mode of action of fibrates became better understood, and (3) cholesterol-lowering drugs had become big business. Scientists had discovered that fibrates inhibited the enzyme Acyl-CoA cholesterol acyltransferase (ACAT), which blocks absorption of cholesterol in the intestine (and may also inhibit plaque-forming cholesterol being deposited within vascular walls). Thus, while statins had become the first-line drugs for lowering lipids, fibrates were still widely prescribed.

### B.    Early 1990s: Merck Develops Cholesterol-Reducing Compounds

121.    In the early 1990s, Merck embarked on a broad research program to discover novel ACAT inhibitors. Scientists for Schering began developing azetidinone[39] compounds that might be useful in reducing cholesterol levels in humans. Those scientists included Stuart B. Rosenblum, Sundeep Dugar, Duane A. Burnett, John W. Clader, and Brian McKittrick.

122.    In lab experiments conducted over several years, these scientists identified a lead compound, "SCH48461," and inherent metabolites and metabolite-like analogues of that compound, including "SCH58235" or "ezetimibe," which eventually would become the active ingredient in Zetia.

---

[39] 2-Azetidinone is a chemical compound with the molecular formula $C_3H_5NO$. It forms the central core structure of certain antibiotics and cholesterol medications.

123.    SCH    48461    is    (3R,3S)-1,4-bis-(4-methoxyphenyl)-3-(3-phenylpropyl)-2-azetidinone.[40] It is pictured in Figure 4 below. The negative enantiomer possesses significantly greater *in vivo* activity.

**Figure 4. SCH 48461**



124.    SCH 58235 is 1-(4-fluorophenyl)-(3R)-[3-(4-fluorophenyl)-(3s)-hydroxypropyl]-(4S)-(4-hydroxypheyl)-2-azetidinone.[41] The use of halogen to block sites of metabolism was then well known. To create SCH 58235, Merck scientists used routine laboratory techniques to add fluorine to the two phenyl rings, in order to lessen the likelihood of hydroxylation (and thereby keep the compound in the body longer). It is pictured in Figure 5 below.

---

[40] *See* Brian G. Salisbury, *Hypocholesterolemic Activity of a Novel Inhibitor of Cholesterol Absorption, SCH 48461,* 115 ATHEROSCLEROSIS 45 (1995)*;* Duane A. Burnett et al., *2-Azetidinones as Inhibitors of Cholesterol Absorption,* 37 J. MED. CHEM. 1733 (1994).

[41] Stuart B. Rosenblum, *Discovery of 1-(4-Fluorophenyl)-(3R)-[3-(4-fluorophenyl)-(3S)-hydroxypropyl]-(4S)-(4-hydroxyphenyl)-2-azetidinone (SCH 58235): A Designed, Potent, Orally Active Inhibitor of Cholesterol Absorption,* 41 J. MED. CHEM. 973 (1998).

**Figure 5. SCH 58235, Ezetimibe**



1  SCH 58235
ED50 0.04 mg/ kg

125.    When Merck discovered these and other useful compounds (and their metabolites), it recognized that they could be developed into lucrative prescription drugs down the road, and sought broad patent protection.

126.    Merck knew that publishing journal articles about its research and development could potentially undermine its ability to patent its inventions. So while its discoveries occurred in the early 1990s, its scientists did not publish their discoveries until after the first patent application was filed and, in some instances, only wrote about the development process over a decade later.[42]

---

[42] *See* John W. Clader, *Ezetimibe and other Azetidinone Cholesterol Absorption Inhibitors*, 5 CURRENT TOPICS MED. CHEM. 243 (2005); John W. Clader, *The Discovery of Ezetimibe: A View from Outside the Receptor*, 47 J. MED. CHEM. 1 (2004); Stuart B. Rosenblum et al., *Discovery of 1-(4-Fluorophenyl)-(3R)-[3-(4-fluorophenyl)-(3S)-hydroxypropyl]-(4S)-(4-hydroxyphenyl)-2- azetidinone (SCH58235): A Designed, Potent, Orally Active Inhibitor of Cholesterol Absorption*, 41 J. MED. CHEM. 973 (1998); Margaret Van Heek et al., *In Vivo Metabolism-Based Discovery of a Potent Cholesterol Absorption Inhibitor, SCH58235, in the Rat and Rhesus Monkey through the Identification of the Active Metabolites of SCH 48461*, 283 J. PHARMACOLOGY & EXPERIMENTAL THERAPEUTICS 157 (1997); Sundeep Dugar et al., *Metabolism and Structure Activity Data Based Drug Design: Discovery of (-) SCH 53079, an Analog of the Potent Cholesterol Absorption Inhibitor (-) SCH 48461*, 11 BIOORGANIC & MED. CHEM. LETTERS 1271 (1996); John W. Clader et al., *2-Azetidinone Cholesterol Absorption Inhibitors: Structure-Activity Relationships on the Heterocyclic Nucleus*, 39 J. MED. CHEM. 3684 (1996); Brian A. McKittrick et al., *Stereoselective Synthesis and Biological Activity of Cis Azetidinones as Cholesterol Absorption*

### C.    1993-1998: Merck Applies For, and Obtains, the Original Azetidinone Patents (the '365, '115, and '966 Patents).

127.    Beginning in 1993, Merck filed a series of related U.S. patent applications addressing hydroxyl-substituted azetidinone compounds useful as hypocholesteremic (i.e., cholesterol-lowering) agents.[43] Three issued as patents; one of these then reissued twice.

128.    The patents resulting from Merck's efforts are referred to herein as "the azetidinone patents." The azetidinone patents include U.S. Patent No. 5,631,365 ("the '365 patent"), U.S. Patent No. 5,767,115 ("the '115 patent"), the U.S. Patent No. 5,846,966 ("the '966 patent"), the RE'721 reissue patent, and the RE'461 reissue patent, as depicted in Figure 6.

**[INTENTIONALLY BLANK]**

---

*Inhibitors*, 16 BIOORGANIC & MED. CHEM. LETTERS 1947 (1996); Brian G. Salisbury et al., *Hypocholesterolemic Activity of a Novel Inhibitor of Cholesterol Absorption, SCH 48461*, 115 ATHEROSCLEROSIS 45 (1995); Sundeep Dugar et al., *Gamma-Lactams and Related Compounds as Cholesterol Absorption Inhibitors: Homologs of the ?-Lactam Cholesterol Absorption Inhibitor SCH 48461*, 24 Bioorganic & Med. Chem. Letters 2947 (1995); Stuart B. Rosenblum et al., Abstract, *Discovery of SCH 58235: A Potent Orally Active Inhibitor of Cholesterol Absorption*, BAYLOR COLLEGE OF MEDICINE XII INTERNATIONAL SYMPOSIUM ON DRUGS AFFECTING LIPID METABOLISM (Nov. 7-10, 1995); Duane A. Burnett et al., *2-Azetidinones as Inhibitors of Cholesterol Absorption*, 37 J. MED. CHEM. 1733 (1994).

[43] Unless otherwise noted, all of the patent applications and communications with the PTO described herein were conducted by Schering Corporation and its agents.

**Figure 6. The Azetidinone Patents**



*All expiration dates are calculated without pediatric exclusivity extensions.

1.    **1993-1994: Merck files two patent applications addressing hydroxylsubstituted azetidinone compounds useful as hypocholesteremic agents.**

129.    On September 21, 1993, Merck filed U.S. Patent Application 102,440, entitled "Hydroxy-Substituted Azetidinone Compounds Useful As Hypocholesterolemic Agents." Merck abandoned the application.

130.    Then, on June 9, 1994, Merck filed U.S. Patent Application 257,593 as a continuation-in-part of the abandoned '440 application.

131.    Both the '440 application and the '593 application disclosed that the inventions described were useful as hypocholesterolemic agents in the treatment and prevention of atherosclerosis—the hardening and narrowing of the arteries due to build-up of fats and cholesterol on artery walls. These applications explained that the liver is the major organ responsible for cholesterol biosynthesis and is the prime determinant of plasma cholesterol levels. When intestinal cholesterol absorption is reduced, less cholesterol is delivered to the liver, which makes less hepatic lipoprotein and clears more plasma cholesterol (mostly LDL). As Merck put it, "[T]he net effect of inhibiting intestinal cholesterol absorption is a decrease in plasma cholesterol levels."

132.    Merck went on to prosecute the '593 application for approximately three years, from June 9, 1994 until May 20, 1997.

2.    **1994-1996: Merck files a third and fourth patent application addressing hydroxyl-substituted azetidinone compounds.**

133.    On September 14, 1994, Merck filed the PCT/US94/10099 application as a continuation-in-part of the '593 application. The PCT'099 application added two example compounds in the specification, 3L and 3M, as well as in vivo data for 3L, 3M, and 6A-1.

41

134.     On March 18, 1996, the PCT'0099 application "entered the national stage" in the United States under 35 U.S.C. § 337 as U.S. Patent Application No. 617,751. The specification for the '751 application, as filed, was identical to the specification of the PCT'0099 application.

135.     Merck prosecuted the '751 application for a little more than two years.

### 3.     Early 1997: Merck obtains its first azetidinone patent, covering processes (the '365 patent).

136.     On May 20, 1997, the '593 application—Merck's second azetidinone patent application—issued as U.S. Patent No. 5,631,365. The '365 patent was the first-issued Merck azetidinone patent.

137.     The inventors of the '365 patent are Drs. Rosenblum, Dugar, Burnett, Clader, and McKittrick, all of whom worked for Schering.

138.     The '365 patent was originally assigned to Schering Corporation. In 2012, Merck Sharp & Dohme became the assignee of the '365 patent by means of a conveyance from Schering Corporation.

139.     The '365 patent states that "the present invention relates to hydroxyl-substituted azetidinones useful as hypocholesterolemic agents in the treatment and prevention of atherosclerosis . . . . The invention also relates to a process for preparing hydroxyl-substituted azetidinones." It observes that "[a] few azetidinones have been reported as being useful in lowering cholesterol and/or in inhibiting the formation of cholesterol-containing lesions in mammalian arterial walls," citing U.S. Patent No. 4,983,594; Ran, INDIAN J. CHEM. (1990); European Patent Publication No. 264,231; European Patent No. 199,630; and European Patent Application No. 337,549.

140.    The summary of the invention describes hypocholesterolemic compounds of formula I (Figure 7) or a pharmaceutically acceptable salt of those compounds. It also states that the invention "relates to" all of the following:

- "[A] method of lowering the serum cholesterol level in a mammal in need of such treatment comprising administering an effective amount of a compound of formula I;"

- "[A] pharmaceutical composition comprising a serum cholesterol- lowering effective amount of a compounds of formula I in a pharmaceutically acceptable carrier;"

- "[T]he use of a hydroxyl-substituted azetidinone cholesterol absorption inhibitor of formula I for combined use with a cholesterol biosynthesis inhibitors [e.g., statins] … to treat or prevent atherosclerosis or to reduce plasma cholesterol levels;" and

- "[A] process for preparing certain compounds of formula I comprising [five specific steps]."

**Figure 7. Hypocholesterolemic Compounds of Formula I**



141.    The specification confirms that the invention includes both enantiomers and racemic mixtures, and that one enantiomer may lead to greater cholesterol inhibition than another: "all isomers, including enantiomers . . . are contemplated as being part of this invention . . . including racemic mixtures." "Isomers can be prepared using conventional techniques, either by reacting chiral starting materials or by separating isomers of a compound of formula I."

43

"Those skilled in the art will appreciate that for some compounds of formula I, one isomer will show greater pharmacological activity than another isomer."

142.    The specification notes that compounds of the invention can exist in "pharmaceutically acceptable" salt forms, identifies at least two dozen salt forms, and describes how to prepare salt forms.

143.    The specification notes that "[c]ompounds of formula I can be prepared by known methods, for example those described below and in WO93/02048" and then describes several methods of preparation. It further discloses that many, if not all, of the "starting compounds" used are "either commercially available or well known in the art and can be prepared via known methods."

144.    The specification also notes

> We have found that the compounds of this invention lower serum lipid levels, in particular serum cholesterol levels. Compounds of this invention have been found to inhibit the intestinal absorption of cholesterol and to significantly reduce the formation of liver cholesteryl (sic) esters in animal models. Thus, compounds of this invention are hypocholesterolemic agents by virtue of their ability to inhibit the intestinal absorption and/or esterification of cholesterol; they are, therefore, useful in the treatment and prevention of atherosclerosis in mammals; in particular in humans.

145.    It goes on to describe the procedure used to determine the in vivo activity of the compounds of formula I, using the "hyperlipidemic Hamster."

146.    The '365 patent has four claims, all of which claim a process of preparing a compound of formula I. Claims 1 and 3 are independent claims; Claims 2 and 4 depend on claims 1 and 3, respectively.

147.    The '365 patent expired on May 20, 2014.

      **4.**      **Late 1997: Merck files a fifth patent application addressing azetidinones, this one addressing combination use with statins.**

148.     On October 14, 1997, Merck filed U.S. Patent Application 953,825—titled "combinations of hydroxyl-substituted azetidinone compounds and HMG CoA reductase inhibitors"—as a continuation-in-part of the '751 application.

      **5.**      **Mid-1998: Merck obtains a second azetidinone patent covering compounds, a composition, and a method of treating atherosclerosis (the '115 patent).**

149.     On June 16, 1998, the '751 application issued as U.S. Patent No. 5,767,115. The '115 patent had nine claims. Claims 1-7 covers compounds, claim 8 covers a pharmaceutical composition for the treatment or prevention of atherosclerosis (or for the reduction of plasma cholesterol levels), and claim 9 covers a method of treating or preventing atherosclerosis (or reducing plasma cholesterol levels) comprising administering to a mammal in need of such treatment an effective amount of a compound of claim 1.

150.     Ezetimibe (the active ingredient in Zetia) is within the scope of claims 1-3, 5, and 7 of the '115 patent. Ezetimibe is designated "6A" and is described in Example 6 at column 31, lines 1-10 of the specification and in claim 7 at column 40, lines 19-21.

151.     According to Merck, the '115 patent expired on June 16, 2015.

      **6.**      **Late 1998: Merck obtains a third azetidinone patent for use in combination with statins (the '966 patent).**

152.     On December 9, 1998, the '825 application issued as U.S. Patent No. 5,846,966.

153.     All claims in the '966 patent refer to a hydroxyl-substituted azetidinone used in combination with an HMG CoA reductase inhibitor—i.e., a statin. Claim 1 refers to hydroxylsubstituted azetidinone compounds used in combination, claims 2-5 refer to compositions of those compounds used in combination, and claim 6 refers to methods of treating or preventing atherosclerosis or reducing plasma cholesterol levels in combination with statins.

Claim 8 explicitly refers to simvastatin (the active ingredient in Merck's Zocor) and atorvastatin (Pfizer's Lipitor).

154.    As a result of this limitation, any generic version of Zetia that was only being used as a monotherapy (as opposed to the combination therapy described in the '966 patent) would not infringe the claims of the '966 patent.

**D.    2000: Merck Asks the PTO to Reissue the '115 Patent With New Ezetimibe Claims.**

155.    In early 2000, Merck—including Schering Corporation—was preparing a New Drug Application for Zetia. Merck closely reviewed the existing patent portfolio, knowing, as all sophisticated pharmaceutical manufacturers do, that the FDA would require them to identify the patents that claim the Zetia product (or a method of using it) by listing them in the Orange Book.

156.    On June 15, 2000, Merck filed Reissue Application No. 09/594,996, asking the PTO to reissue the '115 patent. In preliminary remarks, Merck stated that the reissue application was filed "to correct an error concerning the failure to appreciate the full scope of the invention by not including claims of narrower scope directed to one of the most preferred compounds disclosed in the specification," namely, ezetimibe (described as 1-(4-fluoro[phenyl]-3(R)-[3(S)-(4 fluorophenyl)-3-hydroxypropyl)]-4(S)-(4-hydroxyphenyl)-2-azetidinone). Merck proposed adding claims 10-13, claiming the ezetimibe compound (in both prose and graphic form, claims 10 and 11), a pharmaceutical composition for the treatment or prevention of atherosclerosis or the reduction of plasma cholesterol levels (claim 12), a method of treating or preventing atherosclerosis or reducing plasma cholesterol levels (claim 13), and a method of use thereof.

157.    Merck submitted a declaration in support of reissue signed by James R. Nelson, Staff Vice President and Associate General Counsel, Patents & Trademarks at Schering-Plough

Corporation and Vice President at Schering Corporation. Nelson described the error as "the failure to include a specific claim to one of the most preferred compounds."

E.   **2001-2002: Merck Obtains Approval for Zetia, the RE'721 Patent, and a Corresponding 16-Month Patent Term Extension.**

1.   **2001: Merck files an NDA for Zetia.**

158.   On December 27, 2001, while the application for reissue was pending, Merck submitted NDA 21445 seeking FDA approval to market ezetimibe tablets in the United States under the brand name Zetia for the treatment of hypercholesterolemia.

159.   The sponsor of NDA 21445 is variously identified as Merck/Schering-Plough Pharmaceuticals and as MSP Singapore Company LLC. The proposed labeling submitted with the NDA is marked "COPYRIGHT Merck/Schering-Plough Pharmaceuticals." In correspondence, Schering Corporation is identified as the U.S. agent for MSP Singapore. During its review, the FDA corresponded with Schering's Regulatory Affairs department, including with Joseph F. Lamendola, Jack Scannelli, and Beth DiDomenico.

160.   The FDA took approximately ten months to review Zetia. Merck later sought and obtained a patent term extension for the period of time encompassed by this regulatory review (discussed below).

2.   **2002: The PTO reissues the '115 patent as the RE'721 patent.**

161.   On May 28, 2002, the RE'966 application issued as U.S. Patent No. RE37,721 with new claims 10-13. These included the compound ezetimibe (claims 10-11), a composition of ezetimibe (claim 12), and a method of using ezetimibe to treat or prevent atherosclerosis or reduce plasma cholesterol levels (claims 13).

### 3.     2002: The FDA approves Zetia.

162.     On October 25, 2002, the FDA approved the Zetia NDA and granted it a five-year New Chemical Entity exclusivity. Merck launched Zetia later that month. Zetia quickly became a steady source of profits for Merck, with annual U.S. sales of about $1 billion in 2010, $1.4 billion in 2014, and $2.6 billion by 2016.

163.     The originally approved labeling reflects that Zetia is manufactured for Merck/Schering-Plough Pharmaceuticals by Schering Corporation *or* Merck & Co., Inc.

### 4.     2002: Merck seeks a 16-month patent term extension for the RE'721 patent.

164.     On December 12, 2002, Merck requested an extension of the patent term of the RE'721 patent based on the duration of the FDA's review of the Zetia NDA (pursuant to 35 U.S.C. § 156 and 37 C.F.R. §§ 1.710-1.791). Merck asked for an additional 497 days of patent protection.

165.     Ultimately, on January 17, 2006, the RE'721 patent was extended through October 25, 2016. The PTO, relying on information obtained from Schering and confirmed by the FDA, determined that the RE'721 patent was eligible for a patent term extension of 497 days due to the applicability of the 14-year exception of 35 U.S.C. § 156(c)(3). With this extension, granted in 2006, the RE'721 patent was set to expire on October 25, 2016.

### F.     2006: Merck Obtains its First "Sterol Non-Absorption" Patent (the '106 Patent).

166.     After Merck filed its NDA, but before it was approved, Merck sought to extend its patent protection for Zetia by filing a series of patent applications relating to compounds that inhibit sterol absorption and methods for treating specific conditions with those compounds. Two issued as patents (the '106 patent and the '058 patent). This family of patents as "the sterol non-absorption" applications and patents, depicted in Figure 8.

48

**Figure 8. The Sterol Non-Absorption Patents**



*All expiration dates are calculated without pediatric exclusivity extensions.

167.    The sterol non-absorption applications did not claim priority to, or derive from, the azetidinone applications. Nor did they share any inventors.

168.    On April 18, 2006, Merck's Application No. 10/136,968[44] issued as U.S. Patent No. 7,030,106. The '106 patent was Merck's first sterol non-absorption patent. It has two claims. The inventor is Wing-Kee Philip Cho. The assignee was originally Schering Corporation.

169.    According to Merck, the '106 patent originally was set to expire on January 25, 2022 but received a pediatric extension and is now set to expire on July 25, 2022.

---

[44] On January 25, 2002, Merck filed Utility Application No. 10/057,323. The '323 application claimed priority to two provisional applications, filed in January 26, 2001 and September 21, 2001, respectively. It did not claim priority to, nor was it related to, the azetidinone patents described above. On May 1, 2002, Merck filed Application No. 10/136,968 as a divisional of the '323 application. The '323 and '968 applications purported to address compounds and compositions that inhibited sterol absorption.

170.    The '106 patent specification says that "the present invention relates to therapeutic combinations of peroxisome proliferator-activated receptor (PPAR) activator(s) *and* sterol absorption inhibitor(s) for treating vascular conditions (including atherosclerosis)" (emphasis added).

171.    But neither of the claims in the '106 patent refers to combination use. Both claim pharmaceutical compositions of ezetimibe that were earlier disclosed in the RE'721 patent. Given this and other earlier disclosures, the '106 patent is, and clearly was at the time of its issuance, invalid as obvious and/or for obviousness-type double patenting.

172.    By this time, Merck/Schering had listed in the Orange Book: (1) the RE'721 azetidinone patent; (2) the '966 combination-with-statins patent; and (3) the '106 sterol nonabsorption patent. The '365 process patent was not listed in the Orange Book, likely because process patents—unlike product or method of use patents—are not eligible for listing.

**G.    2006: Glenmark Files the First ANDA for Generic Zetia.**

173.    On October 25, 2006—one year prior to the expiration of the five-year NCE exclusivity and therefore the first day for would-be generic makers of Zetia to file an ANDA for that product—generic drug manufacturer Glenmark filed ANDA 78-560, seeking FDA approval to market an AB-rated generic version of Zetia.[45]

---

[45] The compound represented in Formula II of claims 1 and 2 of the '106 patent is ezetimibe. The table in claims 1 and 2 describing the composition lists lactose monohydrate (a sugar); microcrystalline cellulose (a starch); povidone (a disintegrant); crosscarmellose sodium (a dissolving agent); sodium lauryl sulfate (a foaming agent); and magnesium stearate (a release agent). All are conventional excipients and additives. The RE'721 specification explicitly refers to compositions made using conventional excipients and additives and conventional techniques, including "non-toxic compatible fillers, binders, disintegrants, buffers, preservatives, antioxidants, lubricants, flavorings, thickeners, coloring agents, emulsifiers and the like."

174.    Merck's new chemical entity exclusivity expired on October 25, 2007, one year from the date Glenmark filed. Glenmark could not come to market until after that exclusivity expired.

175.    Glenmark's ANDA included a paragraph IV certification attesting that all of the patents then listed in the Orange Book—the RE'721 azetidinone patent, the '966 combination-with-statins patent, and the '106 sterol non-absorption patent—were invalid, unenforceable or not infringed. Because the '365 process patent was not listed in the Orange Book, Glenmark did not need to certify to it in its ANDA.

**H.    2007-2008: Merck Sues First Filer Glenmark; Glenmark Counterclaims.**

**1.    Early 2007: Merck sues Glenmark for infringing the RE'721 patent (only).**

176.    On or about February 9, 2007, Glenmark notified Merck of its ANDA filing and provided a detailed account of why the patents were invalid, unenforceable, or not infringed by Glenmark's ANDA product.

177.    On March 22, 2007, Merck[46] sued Glenmark in the District of New Jersey. Merck alleged that Glenmark's ANDA infringed the RE'721 patent.

178.    Merck did not sue Glenmark, in this suit or any other, for infringing the two other Orange Book listed patents (the '966 and the '106). Merck apparently did not believe it realistically could expect to win a lawsuit asserting that Glenmark's generic ezetimibe product would infringe the '966 combination-with-statins azetidinone patent or the '106 sterol non-absorption patent because those patents were inapplicable, invalid, or not infringed. First, Glenmark could not infringe the '966 patent because Glenmark's product did not include a statin. Second, the '106 patent was, and is, invalid as obvious, as described above.

---

[46] In this litigation, Schering Corporation and MSP Singapore Company LLC referred to themselves collectively as "Schering." For consistency they are referred to here as "Merck" instead.

179.    Under the Hatch-Waxman Amendments, Merck's filing of the RE'721 lawsuit—irrespective of its prospects of success—triggered an *automatic* 30-month stay, running from the date Glenmark notified Merck of its paragraph IV certification. This stay prevented the FDA from granting final approval of Glenmark's ANDA until the earlier of (i) the expiration of the 30-month stay, or (ii) entry of a final judgment that the RE'721 patent was invalid, unenforceable, or not infringed.[47]

180.    Glenmark represented early on that "[t]he amount at issue in this case is at least $1 billion, representing the anticipated sales by Glenmark of its generic product (and the corresponding loss of sales by [Merck])."

### 2.    Spring 2007: Glenmark counterclaims, alleging that the RE'721 patent is invalid and unenforceable.

181.    On May 23, 2007, Glenmark answered; pleaded numerous affirmative defenses; and counterclaimed, seeking a declaratory judgment that the RE'721 patent was invalid and/or unenforceable.[48] Glenmark asserted that the RE'721 patent was invalid for double patenting, anticipation, obviousness, a lack of enablement, and inventorship issues. Glenmark also asserted that the RE'721 patent was unenforceable due to inequitable conduct and that Merck was estopped or precluded from asserting infringement by reasons of actions taken and statements made to the PTO during its prosecution of the application(s) that led to the RE'721 patent. Glenmark refined these arguments as the litigation progressed.[49]

---

[47] Thirty months from the date Glenmark sent its paragraph IV certification is August 9, 2009. At one point during the litigation, Merck asserted that the 30-month stay expired on October 25, 2010. Plaintiff alleges here that generics would have entered as early as December 6, 2011, so the day on which the stay expired—under either interpretation—is before alleged generic entry and therefore irrelevant to Plaintiff's claims.

[48] Glenmark filed a corrected answer on June 7, 2007. On March 10, 2008, Glenmark filed a first amended answer and counterclaim.

[49] In Glenmark's March 10, 2008 first amended answer and counterclaim, it added a claim asserting that the 497-day patent term extension Merck received for the RE'721 patent was invalid.

182.    *Invalid for "inherent anticipation."* Glenmark argued that at least two compounds claimed in the RE'721 patent were inherent metabolites of a hypercholesterolemic compound (SCH48461) disclosed in an earlier Schering patent application. Merck had disclosed two compounds claimed in the RE'721 patent in an earlier patent application: International Application No. PCT/US92/05972, filed on July 21, 1992 and published on February 4, 1993 as WO 93/02048 (the "PCT'048 publication").[50] Upon ingestion, at least one of these earlier disclosed compounds, SCH48461 (disclosed as Example 9), is metabolized to form two hydroxyl-substituted compounds that are both claimed in the RE'721 patent. These metabolites inherently anticipate the claims of the RE'721 patent.

183.    Under the doctrine of inherent anticipation, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference."[51]

184.    Merck and Schering were aware of the doctrine of inherent anticipation at the time Merck filed suit against Glenmark. That doctrine featured prominently in a case Schering brought against Geneva Pharmaceuticals for allegedly infringing a patent for the prescription drug Claritin.[52] There, on August 8, 2002, the district court concluded that:

> the natural, inevitable production of metabolic DCL upon human ingestion of loratadine, although not fully appreciated by persons of ordinary skill in that field until more recently…, demonstrates that this process is an inherent characteristic or functioning of the use of loratadine, the subject of the '233 patent. Therefore, that

---

[50] The named co-inventors of PCT'048 are Duane A. Burnett, John W. Clader, Tiruvettipuram K. Thiruvengadem, Chou-Hong Tann, and Junning Lee. Burnett and Clader are named as co-inventors of the '721 patent. The publication date of the PCT'048 predates all applications to which the RE'721 claims priority.

[51] *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) , *reh'g denied*, 348 F.3d 992 (2003) (citing *Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991)).

[52] *See Schering Corp. v. Geneva Pharm., Inc.*, 275 F. Supp. 2d 534 (D.N.J. 2002).

patent inherently anticipates Claims 1 and 3 of the '716 patent, rendering them invalid.[53]

185.    The district court observed that "this is not a new doctrine," and cited cases from the 1980s and 90s.[54] The district court also noted that Schering's policy arguments to the contrary were "not persuasive" and that the Patent and Trademark Appeals Board's opinions Schering cited in support of its arguments that inherency by anticipation did not apply were "not consistent with the Federal Circuit law."[55] The Federal Circuit later affirmed.[56]

186.    *Inequitable conduct for failure to disclose inherency.* Glenmark argued that Merck committed inequitable conduct during prosecution of the RE'721 patent by not disclosing the inherency of these metabolites to the PTO. Merck did not do so before the RE'721 patent issued, nor did it do so in any post-issuance communications with the PTO about the RE'721 patent.[57] When inequitable conduct is found, the entire patent becomes invalid and/or unenforceable.

187.    Glenmark identified several publications describing the work that the Merck scientists did to investigate compound SCH48461, its metabolites and metabolite-like analogues, that supported its inherency argument—many authored or reviewed by Merck scientists who were also inventors of the RE'721. Merck never disclosed these publications to the PTO during

---

[53] *Id.* at 542.

[54] *Id.*

[55] *Id.* at 540.

[56] *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373 (Fed. Cir. 2003).

[57] The RE'721 patent issued on May 28, 2002. The district court *Schering v. Geneva* opinion issued on August 2, 2002. On August 14, 2002, Schering filed a Request for Certificate of Correction for the RE'721 patent with the PTO, seeking to correct the priority information recited in the RE'721 patent (likely to ensure that it was treated as an application filed under 35 U.S.C. § 371 and therefore had a later expiration date than the '365 and '966 patents). On December 12, 2002, Schering filed a Request for Patent Term Extension with the PTO. On August 1, 2003, the Federal Circuit affirmed the district court's inherency decision. Schering's request for patent term extension was not resolved until August 29, 2006. Between May 28, 2002 and the conclusion of the patent term extension in 2006, Schering never mentioned inherency or either *Schering v. Geneva* decision in any of its communications with the PTO about the RE'721 patent.

prosecution of the RE'721 patent. Glenmark argued that these publications would have been material to the PTO when examining the RE'721 patent. That Merck withheld them, and key information they contained, reflects deceptive intent.[58] These publications included:

- Margaret Van Heek et al., Abstract, *Isolation and Identification of the Active Metabolite(s) of SCH48461 and Possible in Vivo Mechanism of Action for their Inhibition of Cholesterol Absorption*, BAYLOR COLLEGE OF MEDICINE XII INTERNATIONAL SYMPOSIUM ON DRUGS AFFECTING LIPID METABOLISM (Nov. 7-10, 1995) (the "Van Heek 1995 abstract");

- Harry R. Davis, Jr. et al., Abstract, *The Hypocholesterolemic Activity of the Potent Cholesterol Absorption Inhibitor SCH 58235 Alone and in Combination with HMG CoA Reductase Inhibitors*, BAYLOR COLLEGE OF MEDICINE XII INTERNATIONAL SYMPOSIUM ON DRUGS AFFECTING LIPID METABOLISM (Nov. 7-10, 1995) (the "Davis 1995 abstract");

- Stuart B. Rosenblum et al., Abstract, *Discovery of SCH 58235: A Potent Orally Active Inhibitor of Cholesterol Absorption*, BAYLOR COLLEGE OF MEDICINE XII INTERNATIONAL SYMPOSIUM ON DRUGS AFFECTING LIPID METABOLISM (Nov. 7-10, 1995) (the "Rosenblum 1995 abstract");

- John W. Clader et al., *2-Azetidinone Cholesterol Absorption Inhibitors: Structure-Activity Relationships on the Heterocyclic Nucleus*, 39 J. MED. CHEM. 3684 (1996) (the "Clader 1996 publication");

- Sundeep Dugar et al., *Metabolism and Structure Activity Data Based Drug Design: Discovery of (-) SCH 53079, an Analog of the Potent Cholesterol Absorption Inhibitor (-) SCH 48461*, 11 BIOORGANIC & MED. CHEM. LETTERS 1271 (1996) (the "Dugar 1996 publication");

- Margaret Van Heek et al., *In Vivo Metabolism-Based Discovery of a Potent Cholesterol Absorption Inhibitor, SCH58235, in the Rat and Rhesus Monkey through the Identification of the Active Metabolites of SCH 48461*, 283 J. PHARMACOLOGY & EXPERIMENTAL THERAPEUTICS 157 (1997) (the "Van Heek 1997 publication");[59]

- Stuart B. Rosenblum et al., *Discovery of 1-(4-Fluorophenyl)-(3R)-[3-(4-fluorophenyl)-(3S)-hydroxypropyl]-(4S)-(4-hydroxyphenyl)-2-azetidinone*

---

[58] Rather than repeat the details of Glenmark's discussion of these publications here, LEHB incorporates by reference ¶¶ 30-171 of Glenmark's First Amended Answer and Counterclaims (*Schering Corp. v. Glenmark Pharm., Inc., USA*, No. 07-cv-01334 (D.N.J. Mar. 10, 2008), ECF No. 54), attached as Exhibit A.

[59] Received for publication on February 13, 1997. Accepted for publication on June 30, 1997. Included in the October 1997 issue.

(SCH58235): A Designed, Potent, Orally Active Inhibitor of Cholesterol Absorption, 41 J. MED. CHEM. 973 (1998) (the "Rosenblum 1998 publication").[60]

188.    *Inequitable conduct in prosecuting patent term extension.* Glenmark argued that Merck further committed inequitable conduct when seeking the RE'721 patent term extension, by not disclosing that at least some claims were invalid due to inherent anticipation. Merck sought to extend the term of the RE'721 patent claims after *Schering v. Geneva* was decided, knowing that claims it sought to extend were invalid under the doctrine of inherent anticipation.

189.    *Invalidity for lack of enablement.* Glenmark argued that the RE'721 patent does not teach one skilled in the art how to use ezetimibe to prevent atherosclerosis without further experimentation, which renders claims invalid for lack of enablement.

190.    To be enabled, the specification of the patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. Articles published after a patent application's filing date *can* establish a lack of enablement.

191.    *Failure to name inventors.* Glenmark argued that Merck failed to name all inventors, and took discovery on the issue. On May 10, 2006, PhRMA, the industry group, presented the Discoverers Award for contributions to the discovery of ezetimibe to three individuals: Harry R. Davis, Jr., Dr. Margaret Van Heek, and Kevin B. Alton. Merck had nominated all. None were listed as inventors on the RE'721 patent.

192.    *Lack of proper reissue.* Glenmark argued that reissue was improper, and thus the reissued claims were invalid, for failure to identify an error in the '115 patent of the type that may be properly corrected through reissue.

193.    *Invalidity for obviousness-type double patenting.* Glenmark argued that the subject matter claimed in the RE'721 patent was not patentably distinct from matter claimed in

---

[60] Submitted October 16, 1997.

Merck's earlier issued (and earlier expiring) '365 patent. As a result, at least some claims of the RE'721 patent were alleged to be invalid for obviousness-type double patenting. Obviousness-type double patenting is judicially created doctrine grounded in public policy that prohibits claims in a second patent that are not patentably distinct from claims in a first patent.[61]

### I.    Spring 2009: Glenmark Receives Tentative Approval, and Merck Receives New Regulatory Exclusivities.

194.    On April 24, 2009, the FDA tentatively approved Glenmark's Zetia ANDA. It did so within the 30 months allotted by statute, and so secured Glenmark's first filer 180-day exclusivity.

195.    When Glenmark received tentative approval, the 30-month stay prevented Glenmark from launching.

196.    In 2009, the FDA listed a new exclusivity in the Orange Book—for adding pediatric information to the label—which expired on June 5, 2011. The FDA also added pediatric exclusivities to all listed patents and exclusivities, which expired on December 6, 2011.

### J.    Summer 2009: Glenmark Seeks Partial Summary Judgment on Two Discrete Legal Issues.

197.    In separate motions for partial summary judgment in July of 2009, Glenmark raised two discrete legal issues as to which it did not believe there to be any disputed issues of facts. At that time, trial was scheduled for May of 2010.

198.    *Summary Judgment on Reissue Error.* Glenmark argued that the RE'721 patent was invalid for Merck's failure to identify an error of the type that may be properly corrected in reissue. Glenmark argued that the '115 patent was not, as issued, wholly or partly invalid, and that therefore it could not be properly reissued under 35 U.S.C. § 251.

---

[61] *See* Manual of Patent Examining Procedure, Section 804, Definition of Double Patenting, retrieved July 12, 2017 from https://www.uspto.gov/web/offices/pac/mpep/s804.html.

199.    *Summary Judgment on Double-Patenting.* Glenmark argued that 12 of the 13 claims in the RE'721 patent were invalid by reason of obviousness-type double patenting, in light of Merck's earlier issued '365 patent.

200.    Neither Glenmark nor Merck moved for summary judgment on any of the other issues or arguments listed above (e.g., inherent anticipation, inequitable conduct, lack of enablement, or failure to name inventors). From the fact that Glenmark did not move for summary judgment on other grounds one can only infer that Glenmark (1) preferred to present its other arguments to the finder of fact at trial or (2) believed there to be disputed issues of fact between the parties that would prevent its arguments from being conclusively resolved at the summary judgment phase.

**K.    Fall 2009: Merck Obtains the Second Sterol Absorption Patent (the '058 Patent).**

201.    On November 3, 2009, while the Glenmark summary judgment motions were pending, Merck's Application No. 10/998,400[62] issued as U.S. Patent No. 7,612,058, Merck's second sterol non-absorption patent.

202.    The '058 patent is subject to a terminal disclaimer. According to Merck, it originally was set to expire on January 25, 2022, and with a pediatric extension is set to expire on July 25, 2022.

203.    The '058 patent includes 10 claims. All cover methods of treating conditions associated with high cholesterol (e.g., atherosclerosis, diabetes, obesity) comprising administering a pharmaceutical composition consisting of the same compound and routine pharmaceutical additives described in the '106 patent (Formula II, ezetimibe). The '058 patent

---

[62] On November 29, 2004, Schering filed Application No. 10/998,400 as a divisional of the '968 application, seeking another inhibition of sterol absorption patent. The primary examiner was again San-Ming Hui.

was at the time it was issued, and at all times thereafter, invalid for the same reasons as the '106 sterol non-absorption patent. Like the '106 patent, the named inventor is Philip Wing-Kee Cho.

**L.    Summer 2010: Glenmark and Par Strike a Deal and Merck and Glenmark Settle With a Reverse Payment.**

**1.    The Court sends Glenmark's double-patenting argument to trial.**

204.    On April 19, 2010, the Honorable Jose L. Linares of the U.S. District Court for the District of New Jersey issued opinions addressing each of Glenmark's motions for partial summary judgment. First, the court granted Glenmark's motion on invalidity, agreeing with Glenmark that reissuance of the '115 patent had been improper because Merck had failed to identify the kind of purported error that can be corrected in reissue. This functionally threw out claims 10-13, which claimed ezetimibe expressly and had been added in reissue. Merck moved for reconsideration of this order on April 30, 2010.

205.    On the same day, the court denied Glenmark's second motion for partial summary judgment (obviousness double patenting), concluding that disputed issues of fact as to whether, at the time of the '365 patent, alternative processes for making the claimed azetidinone compounds existed. The court did not hold that there was no double patenting. Rather, the court simply concluded that the issue of double patenting should be resolved by the finder-of-fact at trial, based on a full evidentiary record.

**2.    Eight days before trial, Glenmark agrees to grant Par an exclusive license to sell and market generic ezetimibe in the United States.**

206.    While Merck's lawsuit against Glenmark was pending, Par and Glenmark discussed a licensing agreement for the sale, distribution, and marketing of generic Zetia.

207.    Soon after the Court granted summary judgment on Glenmark's invalidity argument, on May 3, 2010, Par announced it had reached a licensing agreement with Glenmark,

under which Par would be Glenmark's exclusive seller, marketer, and distributor of generic Zetia in the United States.

208.    Par's agreement with Glenmark included an agreement to share the profits, as well as the marketing and litigation costs, relating to the sale of ezetimibe in the United States.

### 3.    Two days before trial, Merck and Glenmark agreed to settle by providing a reverse payment to Glenmark in the form of an agreement by Merck not to bring a competing generic to market.

209.    Trial was scheduled to begin on May 12, 2010, less than a month after the court ruled on the summary judgment motions. At issue were Glenmark's affirmative defenses and counterclaims, including its assertion that claims 1 through 9 were unenforceable because of Merck's intentional failure to disclose to the PTO either (1) compounds claimed in the RE'721 were naturally occurring metabolites of SCH46481 (and therefore inherently anticipated by earlier disclosures) or (2) the disqualifying prior art publications by Merck's own scientists that had been hidden from the PTO.

210.    On May 10, 2010, *two days before the scheduled start of trial*, Merck and Glenmark entered into an agreement that settled the patent infringement lawsuit but, as later events would show, also unlawfully allocated the market for ezetimibe.

211.    That same day, Par announced that "[u]nder the agreement, Par will be able to launch the product on December 12, 2016 or earlier under certain circumstances, head of the April 25, 2017 expiration of Merck's patent exclusivity for ZETIA."

212.    Merck and Glenmark agreed to entry of a consent judgment. In order to ensure there were no adverse rulings concerning the RE'721 patent as a result of the litigation, a condition of the settlement included that the parties seek to have the court vacate its partial summary judgment invalidating claims 10-13 for improper reissue. The parties gave the court a proposed order, along with the consent judgment vacating the partial summary judgment order

on claims 10-13. That proposed order makes reference to the fact that the ruling of the Board of Patent Appeals and Interferences in *Ex parte Tanaka*, on which the Court based its ruling invalidating claims 10-13, had been docketed for appeal.

213.    Consistent with Par's announcement, the proceedings on entry of the consent judgment revealed that the parties had agreed that, subject to certain unrevealed caveats, Glenmark would not enter the market with its generic Zetia product until December 12, 2016.

214.    Although the consent judgment made reference to the settlement agreement, it was not docketed in the court record. The parties did not publicly reveal any of the remaining terms of that agreement at the time of the settlement. Nor have the other terms of that agreement ever been made public.

215.    Certain terms of the agreement were revealed only by later events. Upon information and belief, as a quid pro quo for Glenmark's agreement to drop its patent challenge and delay market entry for over five years, Merck promised not to launch a competing authorized generic version of Zetia during Glenmark's eventual 180-day exclusivity period (the "no-AG agreement"). The existence of a no-AG agreement is inferred from the following facts:

216.    First, Merck previously admitted that marketing an authorized generic is often in its economic interest. For example, speaking about another blockbuster drug, Fosamax, a Merck executive acknowledged that Merck's "authorized generic strategy" will "maximize the value of the franchise" after entry by generic competitors;

217.    Second, Merck had a well-established history of launching authorized generics in the face of generic competition. Other branded drugs for which Merck or Schering has launched authorized generic versions include Blocadren, Clinoril, Cozaar, Diprolene, Lotrisone, Nasonex, Singulair (Oral Granules), Temodar, Blocadren, K-Dur 10, K-Dur 20, and Lotrimin AF;

218. Third, Zetia was a blockbuster drug, with sales in the billions at the time that a generic eventually launched in 2016. Absent Glenmark's reciprocal agreement to delay entering the market, launching an authorized generic would have been in Merck's financial interest;

219. Fourth, when Glenmark launched its generic through Par on December 12, 2016, it issued a press release describing its generic Zetia as "the first and only generic version" of Zetia in the United States, and Endo International plc, Par's corporate parent, issued a substantially identical press release the same day;

220. Fifth, and perhaps most telling, when Glenmark, through Par, eventually did launch generic Zetia in late 2016, Merck did not launch an authorized generic during Glenmark's 180-day ANDA-exclusivity period. The absence of an authorized generic on the market by Merck in late 2016 and the first half of 2017 is strong evidence that Merck had made a contractual agreement with Glenmark, with Par as a knowing, conscious participant in the ensuing conspiracy, not to launch such a product. During this time period—the first six months of generic launch—Merck stood to earn hundreds of millions of dollars from an AG launch; and

221. Sixth, Glenmark reported to its shareholders in May 2017 that it had expected before launching the product that it would take well more than 58% of the combined brand and generic Zetia sales that it had in fact achieved by then. As noted in detail above, in the absence of a no-AG pact, a reasonable pharmaceutical company would realistically expect to take only about a 40% market share during that time period (one half of the standard 80% erosion rate).

222. Given Merck and Glenmark's choice to conceal the terms of their unlawful agreement, and Par's complicity therein, LEHB and the Classes could publicly learn about that Merck was not going to launch an AG only when it had the incentive but declined to launch— late December 2016 and the first six months of 2017. Short of some disclosure of the

confidential settlement agreement, LEHB and the Classes had no other way of knowing about Merck's decision to forego competing using an AG.

### 4. The no-AG agreement was a payment to Glenmark from Merck that benefited Glenmark and Par.

223. The no-AG agreement was a payment to Glenmark from Merck worth substantially more than Glenmark could have earned if it had come to market with generic Zetia in 2011. Glenmark could not have obtained a no-AG agreement even had it won the patent infringement litigation. By delaying generic entry for more than five years, and thereby obtaining the no-AG agreement from Merck, Glenmark was ensured six months of exclusive generic sales, free from competition from Merck's authorized generic or any other generic competitors.

224. Par paid Glenmark to be the exclusive distributor, marketer, and seller of Glenmark's generic ezetimibe, the expected revenues from which turned entirely on any agreement between Glenmark and Merck.

225. Par knew of Merck and Glenmark's agreement, expected to benefit from the agreement, and knowingly benefited from the agreement.

226. Merck and Glenmark, in turn, knew that reaping the no-AG agreement's full benefits required compliance with its terms by Par.

227. For Merck, the benefits of the no-AG agreement were enormous. While it would forgo six months of profits on an authorized generic, in turn it would enjoy more than five years of monopoly profits selling much more expensive and profitable branded Zetia.

228. At this pre-discovery stage, the value of the reverse payment agreement to Merck and Glenmark/Par can be calculated using the known economics of the pharmaceutical industry.

229.    The reverse payment agreement was entered into in May 2010. That agreement delayed Glenmark/Par's generic entry until December 2016. Absent the reverse payment, generic entry would have occurred much sooner than it did, and as early as December 6, 2011.

230.    By that time, other than the RE'721 (addressed momentarily), no other impediments existed to the prompt approval and launch of generic Zetia.

231.    First, Glenmark's ANDA had already received FDA tentative approval. In effect, Glenmark had met all preconditions for final FDA approval other than the 30-month stay that Merck's enforcement of the RE'721 posed against Glenmark.

232.    Second, no other patents held by Merck would forestall generic entry. The '966 patent had claims only to combination products, but generic Zetia is not a combination product, and Merck never enforced the '966 patent against Glenmark. The '106 and '058 sterol nonabsorption patents were obvious in light of the RE'721 disclosures, and Merck never enforced those patents against Glenmark. The '365 patent was limited to the narrow processes set out in that patent, and Merck never enforced the '365 patent against Glenmark.

233.    Third, no other exclusivity existed after December 5, 2011. The NCE exclusivity expired in 2007. Two other exclusivities—an indication exclusivity I-493 and a pediatric exclusivity M-54—were likely capable of being carved out of any generic label, and in any event had expired by December 5, 2011.

234.    Fourth, as evidenced by announcements made by Glenmark and Par on May 3, 2010, Glenmark had a ready and willing partner for sales, marketing, and distribution.

235.    As to the RE'721 patent, in the absence of the reverse payment and with Merck and Glenmark acting as reasonable, economically rational companies, generic entry would have

occurred much sooner than it did—as early as December 6, 2011—on a date to be determined by the jury at trial.

236.    Absent the reverse payment, reasonable, economically rational companies in the position of Glenmark and Merck may still have settled the litigation, but without a reverse payment, and with an earlier agreed entry date. That earlier date would reflect Glenmark's strong chances of winning at trial. Par likely would have urged Glenmark to push for early entry, because it had already paid Glenmark in connection with its licensing agreement, and anticipated beginning to earn that money back soon through distribution. As a result, an arms' length settlement between economically rational, law-abiding companies would have led to an agreed entry date occurring much sooner than it did, and as early as the expiration of any lawful exclusivity, i.e., December 6, 2011. Any such settlement would have required parallel negotiations between Glenmark and Par, given their already-operative licensing agreement.

237.    Alternatively, absent the reverse payment Glenmark would have won the trial scheduled to start in May 2010. A finder of fact would have concluded that (for the reasons described above) Merck failed to prove that Glenmark infringed a valid patent for one or more of the following reasons:

- Merck (through the inventors, agents, and others with a Rule 56 duty) committed inequitable conduct by intentionally and deceptively hiding the fact that the RE'721 claimed compounds that were naturally occurring metabolites of SCH 48461 (and therefore inherently anticipated by its earlier disclosure in PCT'048), which would render the entire RE'721 patent invalid or unenforceable;

- Regardless of whether Merck committed inequitable conduct, the claims of the RE'721 patent were invalid for inherent anticipation; and

- The RE'721 patent was invalid for obviousness-type double patenting over the '365 patent.

238.    Reasonable, economically rational companies in the position of Glenmark and Par would have launched generic Zetia soon after a district court ruling in its favor and the expiration of any other, lawful exclusivity.

239.    Without the large and unjustified payment, several additional generics would have come to market after Glenmark's 180-day exclusivity ended as early as June 6, 2011, and in any event much earlier than June 12, 2017. Merck's last regulatory exclusivity ran on December 6, 2011. By then, Glenmark would have resolved the RE'721 infringement claims by either winning at trial, or settling on competitive terms (without a payment), or launching at risk. And Merck had not accused Glenmark of infringing any other Orange Book listed patents for Zetia.

240.    In the absence of the large and unjustified payment, Merck would have launched its authorized generic version of Zetia at or around the same time that Glenmark launched its generic as early as December 6, 2011 on a date to be determined by the jury.

**5.    The value of the no-AG agreement to Merck.**

241.    With generic entry in December 2011, Merck would have lost about 80% of its branded sales. But without generic entry, it kept all those sales and continued to enjoy those branded sales until the end of 2016.

242.    Because Glenmark was the first ANDA filer, its agreement not to launch generic Zetia until December 2016 created a competition bottleneck wherein no other generic company could market a generic Zetia product until 180 days after Glenmark launched its generic product. In establishing a bottleneck using Glenmark—and, because it shared Glenmark's exclusivity by contract, Par—Merck maximized the potential for it to maintain its monopoly on Zetia for about five years longer than it otherwise would have.

243.    Determining the value to Merck of the no-AG promise is a matter of estimating the additional branded sales it enjoyed during that five-year delay compared to the sales it would

have made (a) from the reduced sales of branded Zetia from December 2011 to June 2017, plus (b) the sales of its authorized generic during the same five-and- a-half-year period.

244.   Sales of branded Zetia in 2011 totaled $1.298 billion. Based on well documented patterns of sales and pricing related to generic entry, Merck's authorized generic and Glenmark/Par's generic, combined, would have captured about 80% of the amount of branded sales in the first six months, with each of those companies splitting the generic sales 50/50 (therefore, 40% each of the brand share). Those generics would have sold at 50% of the price of the brand. Using these assumptions, the value of the authorized generic sales by Merck in the first six months following generic entry in December 2011 would have been about $129.8 million ($1.298 billion times 0.5 [for the first six months] times 0.4 [share of the generic sales] time 0.5 [generic price]).[63] After the exclusivity period, with more than two generic entrants, research in the pharmaceutical industry suggests prices would have dropped to 20% of the brand price pre-entry. The sales of Merck's authorized generic from June 2012 to June 2017 after the expiration of Glenmark's exclusive period would therefore have been $389.4 million ($1.298 billion [2011 baseline total revenues] times 5 [years of competition] times 0.2 [accounting for 80% drop in price with more than two generics] times 0.9 [generic penetration rate in a mature market] divided by 3 [the number of generic Zetia products—Merck's authorized generic, Glenmark's generic, and at least one more generic entrant]). Therefore, the total sales of Merck's authorized generic Zetia from December 2011 to June 2017 would have been $519.2 million ($129.8 million for the first six months of exclusivity plus $389.4 million for the remaining five years).

---

[63] $1,298,000,000 _ 0.50 (1/2 year) _ 0.80 (generic penetration) _ 0.50 (generic price) _ 0.50 (split sales volume with Glenmark) = $129,891,200.

245.    Even with generic entry, Merck could still expect to sell some branded product—based on research in this industry, about 20% of its previous sales volume when Glenmark was the sole generic competitor in the first six months of 2012, and 10% (or less) of its previous volume per year from June 2012 and onward. Thus the revenues of Zetia products to Merck in the event of timely generic entry in, say, late December 2011, over the five-and-a-half-year time period (i.e., from December 2011 to June 2017) reasonably would have been expected to be about $778.8 million ($1.298 billion baseline times 0.5 [the first six-month period in 2012] times 0.2 [branded Zetia's market share after entry of Merck's AG and Glenmark's generic], plus $1.298 billion [baseline] times 0.1 [branded Zetia's market share after entry of other generics] times 5 [for five years ending June 2017]). Consequently, absent the no-AG agreement, Merck's revenues from December 2011 to June 2017, for both Zetia and the AG it would have launched, would have been $1.30 billion ($519.2 million authorized generic's sales plus $778.8 million Zetia's sales).

246.    As a result of the no-AG agreement, however, Merck enjoyed full branded sales from December 2011 through December 2016 without competition from Glenmark/Par's generic (or any other generic). If one expected no growth in sales, then Merck would have about $6.490 billion in gross sales for Zetia over that five-year period. Publically available information indicates that total sales for branded Zetia during this entire time period actually amounted to more than $9.1 billion.

247.    In addition, during the six months between December 2016 and June 2017, when other generic manufacturers received FDA approval, revenues from branded Zetia sales to Merck would have been on the order of $116.8 million ($1.298 billion [baseline] times 0.5 [for half year] times 0.2 [branded Zetia's market share while facing generic competition only from

Glenmark/Par] times 0.9 [anticipating a 10% price reduction from the monopoly price after Glenmark/Par's entry]). Therefore, the total value of no-AG agreement to Merck from December 2011 to June 2017 was $6.61 billion ($6.49 billion plus $116.8 million).

248.    Thus, as a result of the no-AG agreement, Merck enjoyed between about $5.31 billion ($6.61 billion minus $1.30 billion) to about $7.92 billion ($9.1 billion plus $116.8 million from 2017 minus $1.30 billion).

249.    This estimate of the no-AG agreement to Merck may even be conservative: Soon after the settlement, Mylan filed its Zetia ANDA and Merck again sued. Mylan's July 28, 2010 answer contended that Merck had increased the price of Zetia to encourage prescribers and their patients to switch to Vytorin, a drug that combined ezetimibe with simvastatin, the active ingredient of Zocor, a cholesterol-lowering drug that Merck developed earlier. Absent the no-AG agreement, Merck would not have had the same incentive to continue increasing Zetia prices, because diverted sales would flow to Glenmark/Par's generic. With the no-AG agreement, however, Merck could comfortably raise prices on Zetia for the next five years, knowing it would keep some Zetia patients at higher prices and capture those who switched to Vytorin.

### 6.    The value of the no-AG promise to Glenmark and Par.

250.    Determining the value of the no-AG agreement from Glenmark and Par's perspective requires estimating the additional sales Glenmark/Par made during the six-month generic exclusivity period in 2016 compared to the sales it would have made in the first six months of generic competition starting in December 2011 when, without the benefit of the no-AG agreement, it would have faced competition from Merck's authorized generic.

251.    Under competitive conditions, the calculation of Glenmark/Par's sales during the first six months of generic competition starting in December 2011 is identical to the calculation for Merck's AG during this period, because the same assumptions apply to Glenmark/Par's

generic as to Merck's. Thus the value of generic sales by Glenmark/Par in 2011, facing competition from Merck's AG, would have been approximately $129.8 million. How Glenmark and Par's agreement splits profits between them does not change this overall value, only its proportional allocation between them.

252.     Under the anticompetitive conditions of the no-AG promise, however, Glenmark and Par stood in a far better position financially. They would now (a) get 100% (not 50%) of the generic sales in the first six months of generic launch (because there was no authorized generic taking market share); (b) be able to sell that generic during those months for about 90% (not 50%) of the branded price (because there was no authorized generic driving down price); and (c) be able to have their generic product enter a market that had grown in size over the five-year delay period. Indeed, by 2016 annual sales of branded Zetia had grown to $2.6 billion.

253.     Without competition from Merck's authorized generic, Glenmark/Par could expect to capture 80% of sales of Zetia and its AB-rated generic equivalents in 2016, and likely priced their generic at about 90% of branded Zetia's price. As a result, during its six-month exclusivity period in 2016, without competition from Merck's authorized generic, Glenmark/Par likely realized about $936 million in generic sales ($2.6 billion times 0.5 [half a year] times 0.8 [generic penetration] times 0.9 [generic price]).

254.     This means the agreement with Merck to delay Glenmark's launch of generic Zetia until December 2016 was worth approximately $806 million in additional sales to Glenmark/Par, compared to sales they would have made beginning in December 2011 without the benefit of the no-AG agreement ($936 million less $129.8 million). The no-AG payment from Merck to Glenmark made delayed generic entry very lucrative for Glenmark and Par.

255.    Even if Merck, Glenmark, and Par did not foresee the meteoric rise in the sales of the branded product between 2011 and 2016, the no-AG promise was still a lucrative one for Glenmark and Par from that pessimistic perspective in 2011. If one assumes that the sales of branded Zetia remained flat at 2010 levels (when the parties entered into their reverse payment agreement) until Glenmark/Par entered with its generic in 2016, the no-AG promise was still worth an additional $225 million to Glenmark and Par over what they would have made launching their generic in December 2011.[64] Whether or not one assumes that the sales of branded Zetia would have remained flat at 2010 levels, the no-AG pact unlawfully delivered to Glenmark more than it could have obtained even if it had won the patent infringement litigation, and to Par more than it could have obtained as exclusive licensee of Glenmark's.

**M.    2010-2013: After Settling With Glenmark, Merck Seeks Another Reissue and Sues More Generics.**

**1.    Summer 2010: Merck admits invalidity and seeks reissue of the RE'721 patent.**

256.    On June 9, 2010, within a month after its settlement with Glenmark, Merck applied to the PTO for reissuance of the RE'721 patent. Again, to obtain reissue, the applicant must identify an error and attest, under oath, that the original patent is wholly or partly inoperative or invalid. Merck and its agents admitted that the RE'721 patent was invalid, citing inherent anticipation as the reason (as Glenmark had argued).

257.    In the required declaration accompanying its reissue application, Mark Russell, legal director of patents for Schering Corporation attested to an error, and conceded that Glenmark's inherent anticipation argument was correct:

- "I have reviewed and understand the content of the above identified specification, including the claims . . . ."

---

[64] $985,823,000 (2010 brand sales) times 0.5 (six months) times 0.8 (generic penetration) times 0.9 (generic price) = $354,896,280 – $129,891,200 = $225,005,080.

- "I verily believe the original patent to be wholly or partly inoperative or invalid, for the reasons described below . . . by reason of the patentee claiming more than he had the right to claim in the patent."

- "At least one error upon which reissue is based is described as follows: At least one claim of RE37,721 E is potentially inherently anticipated by International published patent application WO 93/02048, filed July 21, 1992 (PCT/US92/05972) and published February 4, 1993 ("the '048 PCT publication"). See also European patent application EP 0524595 A1. In infringement litigation involving RE37,721 E, defendants have alleged that the PCT'048 publication recites, in Example 9, a compound, that when administered to mammals, as also reported in the PCT'048 publication, metabolizes into one or more compounds that fall within the scope of at least claims 1 of RE37,721 E."

- "I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this declaration is directed."

258.    In Merck's preliminary remarks, attorneys Carl A. Morales and James F. Haley, Jr. of Ropes and Gray LLP, attorneys/agents for reissue applicants, made similar statements about inherent anticipation and invalidity being the basis for seeking reissue, and proposed amendments to the claims that ostensibly addressed these problems, namely cancelling claims 1-2 and 4-6 and amending claims 3 and 7-9.

**2.    Summer 2010: Merck sues Mylan and Teva for infringing the RE'721 patent; both counterclaim.**

**(a)    The *Mylan* litigation.**

259.    In or about April 2010, Mylan Pharmaceuticals, Inc. became the second company to file a ANDA for generic Zetia.

260.    Mylan sent its paragraph IV certification for Zetia to Merck on May 25, 2010.

261.    On June 16, 2010, a week after it filed its latest reissue application, Merck sued Mylan for infringement of the RE'721.[65]

262.    Mylan counterclaimed, seeking declarations that both patents were invalid and unenforceable, also asserting claims for damages under the federal antitrust laws and state unjust enrichment laws. Mylan raised many of the arguments initially raised by Glenmark.

### (b)    The *Teva* litigation.

263.    On July 21, 2010, Teva Pharmaceuticals notified Merck that Teva had filed ANDA 78-724 for approval to make generic Zetia, including a paragraph IV certification that the listed patents were invalid and unenforceable.

264.    On September 1, 2010, Merck filed suit against Teva for infringement of the '966 and RE'721 patents in the District of New Jersey. Later that month, Merck formally agreed not to assert the '106 and '058 patents against Teva.

### 3.    Spring 2011: The Federal Circuit functionally overturns the *Glenmark* "error" summary judgment decision.

265.    In April 2011, shortly before the '115 patent was reissued for a second time, the Court of Appeals for the Federal Circuit reversed the Board of Patent Appeals and Interferences' ruling in *Ex parte Tanaka*. In *Tanaka*, the Federal Circuit recognized "the narrow rule" permitting applicants to add "dependent claims as a hedge against possible invalidity," noting

---

[65] Merck initially asserted that Mylan's Zetia product infringed the '966 patent, but withdrew that allegation part way through the litigation. Mylan had earlier filed an ANDA for Vytorin, a Merck product also marketed to combat high cholesterol that includes ezetimibe as one of two active ingredients. Merck's patent infringement suit against Mylan claiming infringement of the RE'721 and '966 patents by the Vytorin ANDA had been filed in December of 2009, and was pending before Judge Linares in the District of New Jersey at the time of the Merck-Glenmark settlement. The Vytorin and Zetia cases against Mylan were consolidated for all purposes in September 2010.

that this rule "has been embraced as a reasonable interpretation of the reissue statute by this court and its predecessor for nearly fifty years."[66]

266.    While this decision effectively overturned the rationale behind the earlier *Glenmark* summary judgment about the technical requirements for invoking the reissue statute, it did not in any way undermine any of Glenmark's other arguments regarding invalidity or unenforceability of the RE'721 settlement.

### 4.    Summer 2011: Merck obtains reissuance of RE'721 patent (RE'461).

267.    On June 14, 2011, the RE'721 patent was reissued as U.S. Patent No. RE42,461.

268.    The RE'461 patent as reissued (or as re-reissued in this case) included only claims 8 through 13, and parts of claims 3 and 7, of the RE'721 patent.

### 5.    Summer 2011-2012: The Mylan and Teva litigations resolve.

#### (a)    2011: Schering and Teva settle.

269.    On July 7, 2011, before any substantive rulings in the case and while its parallel case against Mylan was pending, Merck settled with Teva. Judge Linares entered a consent judgment that prohibited Teva from launching generic Zetia before April 25, 2017. Teva admitted that the RE'461 patent was valid and would be infringed by its generic product. No other terms of the settlement were made public.

#### (b)    2011: The Court denies Merck's motion for summary judgment of inequitable conduct.

270.    On July 25, 2011, Merck filed an amended complaint against Mylan, substituting the newly reissued RE'461 patent for the RE'721 patent.

271.    On August 19, 2011, Mylan filed an answer, affirmative defenses and counterclaims to Merck's amended complaint. In addition to invalidity based on inherent

---

[66] *In re Tanaka*, 640 F.3d 1246, 1251-52 (Fed. Cir. 2011).

anticipation and unenforceability based on failure to disclose prior art, Mylan also alleged that the patents were unenforceable because of an intentional failure to disclose one of the inventors of ezetimibe.

272.    On August 22, 2011, the court denied Merck's motion for judgment on Mylan's defense of inequitable conduct for failure to disclose prior art to the PTO, holding that "Mylan has put forth sufficient indirect and circumstantial evidence from which a reasonable fact finder could conclude that Schering had knowledge of the materiality of the withheld prior art," and that "a deliberate decision to withhold that information could . . . be reasonably inferred from the evidence already presented."[67]

273.    On the same day, Judge Linares granted in part Merck's motion for summary judgment against Mylan, ruling that Mylan's ANDA did infringe claims 3, 10, 11, and 12.

274.    On September 30, 2011, Merck indicated that it would no longer be asserting any claims of the '966 patent against Mylan.

275.    On November 18, 2011, Mylan sent a letter to the Court confirming that it would be withdrawing a defense, namely its claim "based on the non-disclosure of information demonstrating a relationship between compounds claimed in predecessor patents and metabolites of a prior art compound." This withdrawal "thereby reduc[ed] the issues to be tried before the Court on December 5, 2011." Mylan explained that this was done "in the interest of further streamlining the issues remaining for trial" and "having considered the time allotted by the Court for presentation of issues by the parties." Mylan also specifically clarified that it had "not withdrawn its additional defenses based on inequitable conduct, including those related to improper inventorship."

---

[67] The court also noted that "Schering does not appear to dispute that it had knowledge of the metabolite information during prosecution."

276.    Mylan's choice to pursue the inventorship issue rather than other arguments raised earlier in the litigation does not reflect the relative substantive merits of those argument/defenses, or Mylan's own evaluation of them. Instead, the choice simply reflected the untenable position in which Mylan found itself: Mylan had a limited amount of time to present its case, so Mylan picked a single, discrete issue to try.

277.    Mylan knew when it was deciding on its litigation strategy in fall 2011 that even if it won the patent litigation it would enjoy no regulatory or even de facto exclusivity. It knew that Zetia was a blockbuster drug, and that many other generic manufacturers had filed or would ultimately file ANDAs seeking to market generic Zetia. Mylan further knew that both of the previously announced Glenmark and Teva agreements may have included so-called "acceleration clauses" that would permit Glenmark and Teva to enter the market as soon as any other generic manufacturer—such as Mylan—entered. And it knew that, in order to trigger Glenmark's 180-day exclusivity, it would have to prevail in the patent case all the way through the Federal Circuit. Thus, regardless of the time and resources that Mylan poured into trying to win the patent litigation, the most it could hope to win would be (at best) a one-third or one-fourth share or (at worst) a one-seventh share of sales made at a price driven to down near marginal cost.

278.    Mylan's litigation strategy reflected the choice of not necessarily the best substantive defense, but the cheapest and fastest within the practical constraints.[68]

---

[68] Mylan was the first-filer with respect to another drug (Vytorin) involving the same patents at dispute in its Zetia litigation against Merck. But Mylan knew by Fall 2011 that: (1) it would not be entitled to 180-day exclusivity with respect to Vytorin because it would fail to get timely FDA tentative approval; and (2) other generic manufacturers would enter the market with generic Vytorin before or at the time that Mylan entered, even if it won the Vytorin patent case.

6.    **2012: After a trial, the *Mylan* court found no inequitable conduct on inventorship (only).**

279.    Judge Linares held a bench trial in December 2011, solely on the issue of the claimed unenforceability of the RE'461 patent due to Merck's alleged inequitable conduct based on Merck's alleged misrepresentation of the inventorship of the RE'461 patent. The trial did not address any allegations that the RE'461 patent was invalid as obvious over prior art, or any allegations of inequitable conduct based on Merck's failure to disclose invalidating prior art.

280.    On April 27, 2012, the court ruled that Mylan had failed to prove inequitable conduct on the inventorship issue and therefore that the RE'461 patent was not invalid or unenforceable on that basis.[69]

281.    Later, on August 7, 2013, Mylan's ANDA for Zetia received tentative approval from the FDA. To date, Mylan has not launched a generic version of Zetia in the U.S.

7.    **2012-2013: Schering sues Sandoz; Sandoz counterclaims; the parties settle.**

282.    In August 2012, Sandoz notified Merck that Sandoz had filed ANDA 203-931 for approval to market generic Zetia.

283.    On September 27, 2012, Merck sued Sandoz for infringement of the RE'461 patent in the District of New Jersey. In its amended complaint filed May 29, 2013, Merck alleged that the purpose of Sandoz's ANDA submission was to obtain permission under the FDCA to engage in the commercial manufacture, use, offer for sale, and/or sale of Sandoz's generic Zetia prior to the expiration of the RE'461, '966, '106, and '058 patents. In its answer to the amended complaint filed July 26, 2013, Sandoz admitted that it had sought approval to manufacture and sell generic Zetia prior to the expiration of those patents, and further admitted that Sandoz intended to manufacture and sell generic Zetia "immediately and imminently upon approval of

---

[69] Mylan appealed the verdict, but on February 7, 2013, the Federal Circuit Court of Appeals affirmed.

ANDA No. 203931 in light of potential third party exclusivity rights." Sandoz pleaded affirmative defenses including the unenforceability and invalidity of the RE'461 patent.

284.    Sandoz also counterclaimed for a declaratory judgment of the unenforceability of the RE'721 and RE'461 patents, the invalidity and Sandoz's non-infringement of one or more of the claims of those two patents as well as the '106 and '058 patents. Sandoz alleged, *inter alia*, that all the claims of the RE'721 and RE'461 patents were unenforceable due to inequitable conduct because Merck had "failed to disclose publications concerning metabolites of a prior art compound (compound SCH 48461)." Specifically, Sandoz alleged that the publications Merck withheld during prosecution of the RE'721 and RE'461 patents described "metabolic studies of SCH 48461 from which the examiner could determine the structure of metabolites of SCH 48461, and that relevant metabolites were inherently formed by the preparation and administration of SCH 48461, as disclosed in [the PCT'048] patent." Sandoz also alleged that the Van Heek 1997 article had claimed the discovery of ezetimibe in conjunction with Dr. Rosenblum in 1995, and described the "large chemical synthesis program [that] evolved to discover a more potent backup compound for SCH 48461," including the addition of "[a] benzylic hydroxyl group … to SCH 53695 and several sites that were readily metabolized in SCH 48461 were blocked with fluorines resulting in [ezetimibe]." Sandoz additionally averred that the Dugar 1996 article, the Rosenblum I 1995 abstract, and the other prior art publications discussed above had specifically disclosed that two disclosed compounds, dubbed compound 57a and compound 58, were metabolites of SCH 48461 and thus inherently disclosed by the teachings of the prior art PCT'048 patent.

285.    On September 3, 2013, the court ordered Sandoz to provide its ANDA to Merck by September 6, 2016 (ECF 46), and ordered Merck to file its response to Sandoz's counterclaims on or before September 17, 2013.

286.    On September 5, 2013, before the pleadings in the case were closed, and before any further proceedings or any substantive rulings in the case, Merck and Sandoz settled all issues in the patent infringement litigation. Judge Linares entered a consent judgment prohibiting Sandoz from launching generic Zetia before April 25, 2017, and Sandoz admitted that the RE'421 patent was valid and would be infringed by its generic product. No other terms of the settlement were made public.

### N.    2016: Glenmark and Par Launch a Generic Form of Zetia; Merck Does Not.

287.    Glenmark's ANDA 78-560 received final FDA approval on June 26, 2015. In its final approval letter, the FDA reconfirmed that Glenmark was entitled to 180-days of market exclusivity upon launch.

288.    On December 12, 2016, Glenmark, through Par, launched its generic ezetimibe, which its press release of that date described as "the first and only generic version" of Zetia in the United States.

289.    From December 12, 2016, through June 12, 2017, Glenmark's product was the only generic version of Zetia sold in the U.S. market.

290.    Merck refrained from launching an authorized generic version of Zetia during Glenmark's 180-day exclusivity period. It did so pursuant to the no-AG pact in the parties' unlawful agreement.[70]

---

[70] Merck did not launch an authorized generic at the end of Glenmark's 180-day exclusivity in June 2017. But the economics for Merck after Glenmark's 180-day exclusivity were radically different than the economics for Merck would have been (absent the unlawful no-AG pact) during that exclusivity. After the exclusivity, Merck's authorized generic would have been one of at least seven generics on the market,

**O.    2017: 180 days later, Five More Generics Launch.**

291.    On or about June 12, 2017 – the day Glenmark's period of exclusivity expired – the FDA approved ANDAs for generic Zetia previously filed by seven competitor companies: Teva (ANDA 78-724), Sandoz (ANDA 203-931), Amneal (ANDA 208803), Apotex (ANDA208332), Ohm Laboratories (ANDA 207311), Zydus (ANDA 204331), and Watson Laboratories (ANDA 200831).

292.    Five of these manufacturers—Teva, Sandoz, Amneal, Apotex and Ohm Laboratories—launched a generic Zetia product in June 2017, shortly after receiving FDA approval. Zydus launched its generic Zetia product in August 2017. (Watson Laboratories had sold its generic drug business to Teva before June 2017 and so did not launch a generic Zetia product.)

293.    An eighth ANDA, filed by Aurobindo (ANDA 209838), was approved in August 2017 and launched the same month. An additional ANDA, filed by Alkem Laboratories (ANDA 209234), was approved in December 2017.

294.    Whereas only brand-name Zetia tablets were available to purchasers and consumers before December 2016, and only brand-name Zetia and Glenmark/Par's generic tablets were available from December 2016 to June 2017, by July of 2017 there were six generics available to purchasers and consumers in addition to brand tablets, and by September of 2017 there were eight generics in addition to brand tablets.

295.    The average retail price of ezetimibe tablets dropped from $10 per pill before Glenmark's launch, to less than $1 per pill as of December 1, 2017, a 90% decrease.

---

competing for a margin driven down to near marginal cost. During Glenmark's exclusivity, as noted in detail above, a Merck authorized generic would have been one of only two generics on the market, taking at least half the sales at margins that would have yielded more than a hundred million dollars in profits.

296.    Absent the no-AG promise, Merck would have launched an authorized generic during Glenmark's 180-day exclusivity period, taking approximately 50% of Glenmark/Par's generic sales and substantially lowering the price that drug purchasers paid for generic Zetia. Absent the no-AG promise, Glenmark and Par would not have agreed to delay its launch until December 12, 2016, and instead would have entered the market, through Par, much sooner than it did, as early as December 6, 2011. Additional generics would have entered the market six months later and further driven down prices.

297.    The settlement with Glenmark enabled Merck to continue to receive monopoly profits until December 12, 2016, and enabled Glenmark and Par to control the generic market for 180 days thereafter, with Glenmark and Par sharing in the monopoly profits that the reciprocal non-competition pact made possible. The reverse payment agreement not only delayed Glenmark/Par's own entry into the market, it also created a bottleneck that blocked all other would-be generic Zetia competitors by postponing the start (and thus also the conclusion) of Glenmark's 180-day first-filer exclusivity period. Once Glenmark's 180-day exclusivity period expired on June 12, 2017, seven other companies launched their generic Zetia products. Absent Glenmark's unlawful agreement to delay its entry until December 12, 2016, these or other generic manufacturers would have filed their ANDA applications earlier and would have been ready, willing, and able to enter the market on whatever earlier date Glenmark's 180-day exclusivity expired.

298.    The Merck-Glenmark agreement was collusive and intended to maintain a monopoly and allocate the market.

299.    Par knew of this agreement and actively maintained its licensing agreement with Glenmark; did not renege on or abandon that licensing agreement despite its anticompetitive

taint; sold, distributed, and marketed generic Zetia in what it knew were market conditions created by a settlement agreement designed to suppress competition; conspired with Glenmark and committed resources to maintain the generic Zetia monopoly; and reaped its share of the monopoly rents.

300.    Merck and Glenmark could not have implemented their scheme without acquiescence or agreement from Par.

**P.    The No-AG Promise Was a Large Reverse Payment.**

301.    The no-AG payment to Glenmark was large, estimated to be worth more than $800 million. It far exceeded any estimate of the litigation expenses Merck saved by settling the patent case with Glenmark.[71]

302.    The value of the reverse payment agreement to Merck, estimated to be almost $9 billion, was far greater even than the value to Glenmark, because the years-long delay in generic entry protected Merck's monopoly sales volume and pricing over that time.

303.    Merck's reverse payment to Glenmark guaranteed two distinct periods of noncompetition: (a) the period before generic competition, wherein Merck and Glenmark allocated 100% of the market to Merck; and (b) the 180-day exclusivity period after Glenmark's entry, wherein Merck and Glenmark allocated 100% of generic sales to Glenmark. So drug purchasers were overcharged twice: before Glenmark's entry, they were forced to pay overcharges for branded Zetia; and during Glenmark's exclusivity period were forced to pay additional overcharges for branded Zetia and generic Zetia. And the unlawful agreement had the additional anticompetitive effect of delaying the entry of all of the other generic competitors.

---

[71] One 2015 survey of the cost of patent litigation found that litigation expenses for a case such as the one between Merck and Glenmark range from $3.7 million to $6.3 million. *AIPLA 2015 Report of the Economic Survey*, IPICS, http://www.patentinsuranceonline.com/wp-content/uploads/2016/02/AIPLA-2015-Report-of-the-Economic-Survey.pdf (last visited Mar. 26, 2018).

304.    Defendants have no procompetitive explanation or justification for the reverse payment agreement.

305.    If not for the reverse payment settlement agreement between Merck and Glenmark, Glenmark could and would have entered the market much sooner than it did, as early as December 6, 2011, with immediate competition from a Merck authorized generic and full competition with other generics by approximately May 2012. Instead, Glenmark did not release its generic until December 12, 2016, Merck never launched an authorized generic, and generic entry by other manufacturers could not occur until June 12, 2017.

## VIII.   THE SCHEME'S EFFECTS ON COMPETITION AND HARM TO LEHB AND THE CLASSES

306.    Merck's U.S. sales of Zetia were approximately $1.3 billion in 2010, $1.4 billion in 2012, $1.5 billion in 2014, and $2.6 billion in 2016. These amounts represent billions of dollars more in sales than Merck would have achieved absent Defendants' unlawful scheme to impair generic competition. Generic Zetia products would have been priced at a fraction of the cost of branded Zetia, and would have quickly captured the vast majority of the market for ezetimibe.

307.    Merck's and Glenmark's unlawful agreement impaired and delayed the sale of generic Zetia in the United States and unlawfully enabled Merck to sell its branded Zetia at artificially inflated prices, and then allowed Glenmark and Par to sell their generic Zetia at artificially inflated prices. But for Merck's unlawful conduct, generic competitors would have been able to compete, unimpeded, with their own generic versions of Zetia, at a much earlier date.

308.    But for Defendants' anticompetitive conduct, LEHB and other members of the Classes would have: (1) purchased lower-priced generic, AB-rated Zetia, instead of the higher

priced brand Zetia, during the period when Glenmark and Par delayed their entry to the market; (2) paid a lower price for generic Zetia products during Glenmark's 180-day exclusivity period; and (3) paid lower prices for generic Zetia products, as a result of the entry of generics at an earlier date, sooner.

309.    As a consequence, LEHB and other indirect purchasers have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## IX.    MARKET POWER AND DEFINITION

310.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. This disconnect is created by state laws that prohibit pharmacists from dispensing many pharmaceutical products, including Zetia, to patients without a prescription. The patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the product. Thus, switching a patient away from Zetia would likely be driven largely by the patient's doctor.

311.    Brand manufacturers, including Merck, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in selection between branded products.

312.    The lack of both transparency of, and sensitivity to, price in the pharmaceutical marketplace reduces the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced price elasticity, in turn, gives brand manufacturers the ability

to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs without losing sales sufficient to defeat the price increases is what economists and antitrust courts refer to as market or monopoly power. The result of these pharmaceutical-market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Zetia.

313.    Before December 12, 2016, Merck had monopoly power in the market for Zetia and its AB-rated generic equivalents because it had the power to exclude competition and/or raise or maintain supracompetitive prices without losing enough sales to make those prices unprofitable. From December 12, 2016 to June 12, 2017, Merck and Glenmark/Par combined had substantial market power in the market for Zetia and its generic equivalent, because they had the power to exclude competition and/or raise or maintain the price of ezetimibe at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

314.    At all relevant times, a small but significant, non-transitory increase to the price of Zetia and its AB-rated generic equivalents would not have caused a loss of sales sufficient to make that increase unprofitable.

315.    Other ezetimibe products or treatments for hypercholesterolemia are not economic substitutes for Zetia and its AB-rated generic equivalents. As an economist might put it, brand Zetia does not exhibit significant, positive cross-elasticity of demand with respect to price with any other than AB-rated generic versions of Zetia.

316.    Brand Zetia is differentiated from all other ezetimibe products, and all other hypercholesterolemia treatments, other than the AB-rated generic versions of brand Zetia,

meaning it has at least some market power even relative to other ezetimibe products. This "differentiation" is attributable to the reputation effects of branding and other factors.

317.    Merck (and, later, Merck, Glenmark, and Par) needed to control only brand Zetia and its AB-rated generic equivalents, and no other products, to maintain supracompetitive prices. Only the market entry of competing, AB-rated generic versions would render Defendants unable to profitably maintain their prices for Zetia and its AB-rated generic equivalents—of which Glenmark/Par's was the only one during the 180-day exclusion period—without losing substantial sales.

318.    During the 180-day exclusion period, Merck sold brand Zetia and Par sold generic Zetia at prices well in excess of marginal costs and in excess of the competitive price, and, therefore, Merck, Glenmark, and Par (splitting profits with Glenmark) enjoyed high profit margins.

319.    Defendants had, and exercised, the power to exclude generic competition to Zetia and its AB-rated generic equivalents.

320.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected branded Zetia and, in turn, Glenmark/Par's generic Zetia, from the forces of price competition.

321.    Direct evidence of market power and anticompetitive effects available in this case obviates the need to establish a relevant antitrust market. This direct evidence of Defendants' ability to control the price of Zetia and generic Zetia, and to exclude ready, willing entrants, consists of, inter alia, the following facts: (a) Merck's gross margin on Zetia (including the costs of ongoing research/development and marketing) at all relevant times was very high; (b) Merck never lowered the price of Zetia to the competitive level in response to the pricing of other brand

or generic drugs other than the AB-rated generic Zetia; and (c) a generic Zetia seller would have entered the market at a much earlier date, at a substantial discount to brand Zetia, but for Defendants' anticompetitive conduct.

322.    To the extent proof of monopoly power by defining a relevant product market is required, LEHB alleges that the relevant antitrust market is the market for Zetia and its AB-rated generic equivalents.

323.    The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

324.    Merck's market share in the relevant market was 100% until December 12, 2016, after which Merck, Glenmark, and Par collectively had 100% market share in the relevant market until June of 2017, when Teva, Mylan, Sandoz, Amneal, Apotex, Ohm Laboratories/Sun Pharmaceuticals, Zydus, and Watson Laboratories all launched generic Zetia products.

## X.    ANTICOMPETITIVE EFFECTS

325.    Defendants willfully and unlawfully maintained their market power by engaging in a conspiracy to exclude competition. Defendants designed a scheme to delay competition on the merits, to further Merck's anticompetitive purpose of forestalling generic competition against Zetia, in which Glenmark and Par cooperated to increase their own profits. Merck, Glenmark, and Par carried out the scheme with the anticompetitive intent and effect of maintaining supracompetitive prices for ezetimibe tablets.

326.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Zetia, and later Glenmark and Par's generic Zetia, from competition. These actions allowed Defendants to maintain a monopoly and exclude competition in the market for Zetia and its AB-rated generic equivalents, to the detriment of Plaintiff and all other members of the Classes.

327.    Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Merck, Glenmark, and Par to sell Zetia without further generic competition. Were it not for Defendants' illegal conduct, one or more additional generic versions of Zetia would have entered the market sooner, and Glenmark/Par's generic would have faced competition during Glenmark's 180-day exclusivity period from a Merck authorized generic.

328.    Defendants' illegal acts and conspiracy to delay generic competition for Zetia caused LEHB and all members of the Classes to pay more than they would have paid for ezetimibe absent this illegal conduct.

329.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, indirect purchasers, such as LEHB and members of the Classes, would have paid less for ezetimibe by (a) paying lower prices on their remaining brand purchases of Zetia, (b) substituting purchases of less-expensive generic Zetia for their purchases of more-expensive brand Zetia, and/or (c) purchasing generic Zetia at lower prices sooner.

330.    Thus, Defendants' unlawful conduct deprived LEHB and members of the Classes of the benefits from the competition that the antitrust laws are designed to ensure.

## XI.    ANTITRUST IMPACT AND INTERSTATE COMMERCE

331.    During the relevant time period, Defendants manufactured, sold, and shipped Zetia and generic Zetia across state lines in an uninterrupted flow of interstate commerce.

332.    During the relevant time period, LEHB and members of the Classes purchased substantial amounts of Zetia and/or generic Zetia indirectly from Defendants. As a result of Defendants' illegal conduct, LEHB and members of the Classes have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

333.    During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged in herein, within the flow of, and substantially affecting, interstate commerce.

334.    During the class period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## XII.    EFFECT ON INTRASTATE COMMERCE

335.    During the relevant time period, branded Zetia, manufactured and sold by Merck, was shipped into each state and was sold to or paid for by End-Payors. Beginning around December 12, 2016, generic Zetia, manufactured and sold by Glenmark, was shipped into each state and was sold to or paid by End-Payors.

336.    During the relevant time period, in connection with the purchase and sale of branded Zetia, money exchanged hands and business communications and transactions occurred in each state. Beginning around December 12, 2016, in connection with the purchase and sale of generic Zetia, money exchanged hands and business communications and transactions occurred in each state.

337.    Defendants' conduct as set forth in this Complaint had substantial effects on intrastate commerce in that, inter alia, retailers within each state were foreclosed from offering cheaper Zetia and generic ezetimibe to End-Payors purchasing inside each respective state, and Defendants entered into an unlawful anticompetitive agreement that affected commerce in each state.

**XIII.  DEFENDANTS' FRAUDULENT CONCEALMENT TOLLED THE APPLICABLE STATUTES OF LIMITATIONS AND DELAYED ACCRUAL OF LEHB'S CAUSES OF ACTION**

338.    A cause of action accrued for LEHB and the Classes each time LEHB paid for or reimbursed a purchase of Zetia or its generic equivalent at a supracompetitive price made possible by their anticompetitive conduct. The December 2016 launch by Par/Glenmark, Merck's forgoing a launch of an AG since then, and each sale by Defendants of a product at a supracompetitive constitute overt acts in furtherance of their anticompetitive scheme. Accordingly, LEHB and the Classes are entitled to recover all damages on all sales that Defendants made to them at supracompetitive prices.

339.    Due to Defendants' concealment of the terms of the Merck-Glenmark settlement, LEHB and members of the Damages Class are entitled to recover damages reaching back beyond any limitations periods otherwise applicable to their claims, because the earliest they could reasonably have learned of Defendants' conspiracy was in December 2016, when Par/Glenmark began selling generic Zetia and Merck did not respond with an AG. Merck, Glenmark, and Par had earlier disclosed only cursory information about the existence of the settlement. The LEHB and members of the Classes had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence, nor did they have the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, or believe in good faith that a violation had been committed, until December 2016.

340.    This is true because of the nature of Defendants' scheme was self-concealing and because Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, their contract, combination, conspiracy and scheme.

341.    Defendants and co-conspirators wrongfully and affirmatively concealed the existence of their ongoing combination and conspiracy from LEHB and members of the Classes by, among other things:

342.    Concealing the fact of Merck's agreement not to launch a competing authorized generic Zetia product in exchange for Glenmark's agreement, with Par's knowing acquiescence, not to market its competing generic product until December 12, 2016;

343.    Concealing the fact that the purpose of the no-AG agreement was to provide compensation in connection with the settlement of the patent litigation and the December 2016 entry date for Glenmark/Par's generic product; and

344.    Filing documents with the United States Securities and Exchange Commission that failed to disclose the existence or nature of the payments made.

345.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the LEHB's and Class members' claims have been tolled, and the accrual of LEHB and Class members' causes of action have been delayed.

## XIV.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Sections 1 of the Sherman Act
### (On Behalf of Plaintiff and the Injunctive Relief Class)

346.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

347.    Merck and Glenmark violated 15 U.S.C. § 1 by entering into an unlawful reverse payment agreement that restrained competition in the market for Zetia and its AB-rated generic equivalents.

348.    Par violated 15 U.S.C. § 1 by furthering the unlawful reverse payment agreement's objective to restrain competition in the market for Zetia and its AB-rated generic equivalents.

349.    Indirect purchasers have been injured in their business or property by the violation of 15 U.S.C. § 1. The indirect purchasers' injury consists of having paid higher prices for their ezetimibe requirements than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes Defendants' conduct unlawful. Plaintiff is the proper entity to bring a case concerning this conduct.

350.    From the launch of brand Zetia in 2002 through December 12, 2016, Merck possessed monopoly power in the relevant market—i.e., the market for sales of ezetimibe in the United States. But for Defendants' wrongful conduct, as alleged herein, Merck should have lost its monopoly power in the relevant market as early as December 6, 2011, and in any event well before December 12, 2016.

351.    On or about May 10, 2010, Merck and Glenmark entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Merck paid Glenmark substantial consideration in exchange for Glenmark's agreeing to delay bringing its generic version of Zetia to the market. Par knowingly acquiesced to, was consciously committed to, and furthered this illegal contract, combination, and restraint of trade. The purpose and effect of the agreements between Defendants were to: (a) delay generic entry of Zetia in order to lengthen the period in which Merck's brand Zetia could monopolize the market and make supracompetitive profits; (b) keep an authorized generic off the market during Glenmark's 180-day generic exclusivity period, thereby allowing Glenmark and Par to monopolize the

generic market for Zetia during that period, and allowing Glenmark and Par to make supracompetitive profits; and (c) raise and maintain the prices that LEHB and other members of the Classes would pay for Zetia at supracompetitive levels until at least June 12, 2017.

352.    From December 12, 2016 through June 12, 2017, Merck shared its monopoly power with Glenmark and Par, and the three companies jointly maintained an illegal monopoly throughout that time.

353.    The May 2010 reverse payment agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

354.    Merck, Glenmark, and Par are liable for this reverse payment agreement under a "rule of reason" standard under the antitrust laws.

355.    There is and was no legitimate, non-pretextual, procompetitive business justification for this reverse payment agreement that outweighs its harmful effect on indirect purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

356.    As a direct and proximate result of Merck's, Glenmark's, and Par's anticompetitive conduct, including the reverse payment, LEHB was harmed.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 2 of the Sherman Act**
**(On Behalf of Plaintiff and the Injunctive Relief Class)**

357.    LEHB hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

358.    Merck, Glenmark, and Par entered into a conspiracy to monopolize in violation of 15 U.S.C. § 2 by having Merck and Glenmark into the reverse payment agreement inuring to the benefit of Merck, Glenmark, and Par.

359.    Indirect purchasers have been injured in their business or property by the violation of 15 U.S.C. § 2. Such injury consists of having paid higher prices for their ezetimibe requirements than they would have paid in the absence of those violations. Such injury is of the type antitrust laws were designed to prevent, and it flows from that which makes Defendants' conduct unlawful. LEHB is the proper entity to bring a case concerning this conduct.

### THIRD CLAIM FOR RELIEF
### Violation of State Antitrust Laws
### (On Behalf of Plaintiff and the Damages Class)

360.    LEHB hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

361.    At all relevant times, Merck, Glenmark, and Par possessed substantial market power (i.e., monopoly power) in the relevant market. Merck, Glenmark, and Par possessed the power to control prices in, prevent prices from falling in, and exclude competitors from, the relevant market.

362.    Through their conspiracy, Merck, Glenmark, and Par willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and thereby injured competition, LEHB, and the Classes.

363.    LEHB and members of the Damages Class have been injured in their business or property by Merck's, Glenmark's, and Par's antitrust violations. Their injury consists of having paid higher prices for their ezetimibe requirements than they would have paid in the absence of those violations.

364.    It was Merck's, Glenmark's, and Par's conscious objective to further their dominance in the relevant market by and through their conspiracy.

365.    There is no valid procompetitive business justification for Merck's, Glenmark's, and Par's anticompetitive conduct, and to the extent any of them offers one, it is pretextual and

not cognizable, and any procompetitive benefits of Merck's, Glenmark's, and Par's conduct do not outweigh its anticompetitive harms.

366.    By engaging in the foregoing conduct, Merck, Glenmark, and Par intentionally and wrongfully maintained monopoly power in the relevant market in violation of the following state laws:

     a.  Ala. Code § 6-5-60, with respect to purchases in Alabama by the Damages Class Members;

     b.  Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by the Damages Class Members;

     c.  Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by the Damages Class Members;

     d.  D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by the Damages Class Members;

     e.  Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by the Damages Class Members;

     f.  740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

     g.  Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa by the Damages Class Members;

     h.  Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

     i.  Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by the Class Members;

     j.  Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by the Damages Class Members;

     k.  Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by the Damages Class Members;

     l.  Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class Members;

     m.  Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by the Damages Class Members;

n.  Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by the Damages Class Members, in that thousands of sales of branded and generic versions of Zetia took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendant's conduct;

o.  N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire by the Damages Class Members;

p.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by the Damages Class Members;

q.  N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by the Damages Class Members;

r.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by the Damages Class Members;

s.  N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by the Damages Class Members;

t.  Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by the Damages Class Members;

u.  S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by the Damages Class Members;

v.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by the Damages Class Members, with thousands of end-payors in Tennessee paying substantially higher prices for branded and generic versions of Zetia at Tennessee pharmacies;

w.  Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damage Class Members who are either citizens or residents of Utah;

x.  Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by the Damages Class Members;

y.  W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by the Damages Class Members; and

z.  Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for branded and generic versions of Zetia at Wisconsin pharmacies.

367.    Plaintiff and the Damages Class Members have been injured in their business or property by Merck, Glenmark, and Par's antitrust violations. Their injuries consist of (1) being denied the opportunity to purchase lower-priced generic versions of Zetia, and (2) paying higher prices for these products than they would have paid in the absence of Merck's wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Merck's conduct unlawful.

368.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Merck's anticompetitive conduct

### FOURTH CLAIM FOR RELIEF
#### Violation of State Consumer Protection Statutes
#### (On Behalf of Plaintiff and the Damages Class)

369.    LEHB hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

370.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices by knowingly acting in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in the following states, and took efforts to conceal their conduct from LEHB and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of the laws of the following states. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout the states listed below; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout the states listed below; (3) LEHB and members of the Damages Class were

deprived of free and open competition; and (4) LEHB and members of the Damages Class paid

supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents.

371.    During the Class Period:

a.    Merck, Glenmark, and Par engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*;

b.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-101, *et seq.*;

c.    Merck, Glenmark, and Par engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*;

d.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*;

e.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*

f.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*;

g.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

h.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.*;

i.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.*;

j.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*;

k.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.*;

l.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

m.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

n.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.*;

o.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*;

p.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*;

q.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*;

r.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*;

s.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*;

t.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

u.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*;

v.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota

Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.*;

w.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, 73 Pa. Stat. Ann. §§ 201–1, *et seq.*;

x.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

y.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*;

z.  Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*;

aa. Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.*;

bb. Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq.*;

cc. Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.*;

dd. Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*;

ee. Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.*; and

ff. Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq.*

372.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, LEHB and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the above-referenced statutes, and, accordingly, LEHB and members of the Damages Class seek all relief available under those statutes.

### FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Damages Class)**

373.    LEHB hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

374.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

375.    Merck, Glenmark, and Par unlawfully benefited from their sales of Zetia and its AB-rated generic equivalents because of the unlawful and inequitable acts alleged in this Complaint. Merck, Glenmark, and Par unlawfully overcharged LEHB, who made purchases of or reimbursements for Zetia and its AB-rated generic equivalents at prices that were more than they would have been but for Merck's, Glenmark's, and Par's unlawful actions.

376.    Merck's, Glenmark's, and Par's financial benefits resulting from its unlawful and inequitable acts are traceable to overpayments by LEHB and the Damages Class. LEHB and the Damages Class have conferred upon Merck, Glenmark, and Par an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of LEHB and the Damages Class.

377.    Merck, Glenmark, and Par have been enriched by revenue resulting from unlawful overcharges for Zetia and its AB-rated generic equivalents while LEHB and the

Damages Class have been impoverished by the overcharges they paid for Zetia and its AB-rated generic equivalents imposed through Merck's, Glenmark's, and Par's unlawful conduct.

378.    Merck's, Glenmark's, and Par's enrichment and LEHB's and the Damages Class's impoverishment are connected.

379.    There is no justification for Merck's, Glenmark's, and Par's retention of, and enrichment from, the benefits they received that caused impoverishment to LEHB and the Damages Class, because LEHB and the Damages Class paid supracompetitive prices that inured to Merck's, Glenmark's, and Par's benefit, and it would be inequitable for Merck, Glenmark, and Par to retain any revenue gained from their unlawful overcharges.

380.    LEHB and the Damages Class did not interfere with Merck's, Glenmark's, and Par's affairs in any manner that conferred these benefits upon Merck, Glenmark, or Par.

381.    The benefits conferred upon Merck, Glenmark, and Par were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Merck's, Glenmark's, and Par's illegal and unfair actions to inflate the prices of Zetia and its AB-rated generic equivalents.

382.    The benefits conferred upon Merck, Glenmark, and Par are measurable, in that the revenue Merck, Glenmark, and Par earned due to their unlawful overcharges for Zetia and its AB-rated generic equivalents is ascertainable by review of sales records.

383.    It would be futile for LEHB and the Damages Class to seek a remedy from any party with whom they have privity of contract. Merck, Glenmark, and Par paid no consideration to any other person for any of the unlawful benefits it received indirectly from LEHB and the Damages Class with respect to Merck's, Glenmark's, and Par's sales of Zetia and its AB-rated generic equivalents.

384.     It would be futile for LEHB and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Zetia and its AB-rated generic equivalents, as the intermediaries are not liable and cannot reasonably be expected to compensate LEHB and the Damages Class for Merck's, Glenmark's, and Par's unlawful conduct.

385.     The economic benefit of overcharges and monopoly profits derived by Merck, Glenmark, and Par through charging supracompetitive and artificially inflated prices for Zetia and its AB-rated generic equivalents is a direct and proximate result of Merck's, Glenmark's, and Par's unlawful practices.

386.     The financial benefits derived by Merck, Glenmark, and Par rightfully belong to LEHB and the Damages Class, because LEHB and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Merck, Glenmark, and Par.

387.     It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, for Merck, Glenmark, and Par to be permitted to retain any of the overcharges for Zetia and its AB-rated generic equivalents derived from Merck's, Glenmark's, and Par's unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

388.     Merck, Glenmark, and Par are aware of and appreciate the benefits bestowed upon them by LEHB and the Damages Class. Merck, Glenmark, and Par consciously accepted the benefits and continue to do so as of the date of this filing.

389.    Merck, Glenmark, and Par should be compelled to disgorge in a common fund for the benefit of LEHB and the Damages Class all unlawful or inequitable proceeds they received from their sales of Zetia and its AB-rated generic equivalents.

390.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Merck, Glenmark, and Par traceable to indirect purchases of Zetia and its AB-rated generic equivalents by LEHB and the Damages Class.

391.    LEHB and the Damages Class have no adequate remedy at law.

392.    By engaging in the foregoing unlawful or inequitable conduct depriving LEHB and the Damages Class of the opportunity to purchase lower-priced Zetia and its AB-rated generic equivalents and forcing them to pay higher prices for both, Merck, Glenmark, and Par have been unjustly enriched in violation of the common law of the following jurisdictions:

393.    District of Columbia, Puerto Rico, the U.S. Virgin Islands, and the following states:

     a.  State of Alabama;

     b.  State of Alaska;

     c.  State of Arizona;

     d.  State of Arkansas;

     e.  State of California;

     f.  State of Colorado;

     g.  State of Connecticut;

     h.  State of Delaware;

     i.  State of Florida;

     j.  State of Georgia;

k.  State of Hawaii;

l.  State of Idaho;

m.  State of Illinois;

n.  State of Iowa;

o.  State of Kansas;

p.  Commonwealth of Kentucky;

q.  State of Louisiana;

r.  State of Maine;

s.  State of Maryland;

t.  Commonwealth of Massachusetts;

u.  State of Michigan;

v.  State of Minnesota;

w.  State of Mississippi;

x.  State of Missouri;

y.  State of Montana;

z.  State of Nebraska;

aa. State of Nevada;

bb. State of New Hampshire;

cc. State of New Jersey;

dd. State of New Mexico;

ee. State of New York;

ff.  State of North Carolina;

gg. State of North Dakota;

hh. State of Oklahoma;

ii.  State of Oregon;

jj.  Commonwealth of Pennsylvania;

kk. State of Rhode Island;

ll.  State of South Carolina;

mm.  State of South Dakota;

nn. State of Tennessee;

oo. State of Texas;

pp. State of Utah;

qq. State of Vermont;

rr.  Commonwealth of Virginia;

ss.  State of Washington;

tt.  State of West Virginia;

uu. State of Wisconsin; and

vv. State of Wyoming

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes, respectfully demands that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare Plaintiff as the representative of the Classes;

B.    Enter joint and several judgments against Defendants and in favor of Plaintiff and the Classes;

C.    Grant Plaintiff and the Classes equitable relief in the nature of an injunction, disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

D.    Award the Damages Class damages, and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial;

E.    Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

F.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XVI.    JURY DEMAND

394.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Classes, demands a trial by jury on all issues so triable.


Dated: March 28, 2018

                                    **GRANT & EISENHOFER P.A.**

                                    */s/ Robert G. Eisler*

                                    Robert G. Eisler
                                    Deborah A. Elman
                                    Chad B. Holtzman
                                    Allison J. McCowan
                                    485 Lexington Avenue
                                    New York, NY 10017
                                    Tel: (646) 722-8500
                                    Fax: (646) 722-8501
                                    reisler@gelaw.com
                                    delman@gelaw.com
                                    choltzman@gelaw.com
                                    amccowan@gelaw.com

                                    *Counsel for Plaintiff Law Enforcement
                                    Health Benefits Inc. and the Proposed Class*